**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                                 :
LAUREN E. SUMMA,                                                 :
                                                                 :
                                    Plaintiff,                   :     Civil Action No.
                                                                 :
                                                                 :     08-cv-00361 (LDW) (WDW)
              v.                                                 :
                                                                 :     **AMENDED COMPLAINT**
                                                                 :
HOFSTRA UNIVERSITY, DAVID COHEN, and                             :
MELISSA CONNOLLY in their individual and                         :
official capacities.                                             :     <u>Jury Trial Demanded</u>
                                                                 :
                                    Defendants.                  :
                                                                 :
-----------------------------------------------------------------X

Plaintiff Lauren E. Summa ("Plaintiff" or "Ms. Summa"), by and through her

undersigned counsel, as and for her Amended Complaint in this action against Defendant

Hofstra University ("Defendant Hofstra," "Hofstra," or "the University"), Head Football

Coach David Cohen ("Coach Cohen" or "Defendant Cohen"), and Vice President of

University Relations Melissa Connolly ("Defendant Connolly") (together, "Defendants"),

hereby alleges as follows:

### <u>NATURE OF THE CLAIMS</u>

1.      This is an action for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendants' unlawful employment practices and other

unlawful conduct, including their unlawful discrimination, harassment and retaliation

against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e <u>et seq.</u> ("Title VII"), Title IX of the Education Amendments of 1972, 20 U.S.C. §§

1

1681 et seq. ("Title IX"), and the New York State Human Rights Law, New York Executive Law §§ 290 et seq.

2.     Defendants repeatedly subjected Plaintiff to unlawful gender discrimination, harassment and retaliation during her employment on campus.  The hostile work environment Plaintiff endured while working as an Assistant Athletic Manager on the men's football team included being subjected to offensive and sexually graphic movies in the presence of howling and taunting male students, a male student taunting Plaintiff with highly offensive and sexist comments, and being locked in a bathroom by a group of male students.  At all times, Defendant Hofstra University's football coaches, headed by Defendant Cohen, condoned and accepted the behavior or acted deliberately indifferent to it despite having an explicit duty as supervisors to prevent acts of discrimination.  When informed of the behavior, Hofstra's Equal Opportunity Office conducted a sham investigation that excluded Plaintiff from any involvement and failed to abide by its own internal procedures for investigating harassment.

3.     Shortly after making formal complaints with the University and government agencies regarding her treatment, Plaintiff was retaliated against on two occasions under plainly unlawful circumstances.  Defendant Cohen and the University denied Plaintiff continued employment with the football team in the spring of 2007 despite previous assurances that her tenure would continue.  Two months later, Defendant Connolly and the University denied Plaintiff a Graduate Assistantship in the Office of University Relations despite an outstanding, unconditional offer of employment.

2

4.      Defendants' conduct was knowing, malicious, willful and wanton and/or showed deliberate indifference towards Plaintiff, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages, permanent harm to her professional and personal reputation, and mental anguish and emotional distress.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and Title IX.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful harassment and retaliation, occurred in this district.

## PARTIES

7.      Plaintiff Lauren E. Summa is a woman in her second year as a graduate student at Hofstra University and currently lives on campus.  At all relevant times, Ms. Summa worked for Defendant Hofstra on the University campus and at various other college campuses during away football games.   At all relevant times, she met the definition of an "employee" and/or "student" under all applicable statutes.

8.      Defendant Hofstra University is a private, nonsectarian, coeducational university that employs students in various school departments.  Defendant Hofstra University has maintained a place of business in Hempstead, New York as well as other

3

locations within Nassau County and the United States where University business is conducted. Hofstra University receives federal funding through federal financial aid programs used by their students.

9.      At all relevant times, Defendant Hofstra University has met the definition of an "employer" under all applicable statutes.

10.     Defendant David Cohen is the male Head Coach of the Hofstra University Football Team who, upon information and belief, resides in Nassau County. At all relevant times, he participated directly in discrimination and retaliation and failed to remedy or investigate Ms. Summa's complaints of harassment.

11.     Melissa Connolly is the Vice President of University Relations who, upon information and belief, resides in Nassau County. At all relevant times, she participated directly in discrimination and retaliation.

### PROCEDURAL REQUIREMENTS

12.     On or about May 3, 2007, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") which was dual filed with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII in relation to the harassment committed by Hofstra students during Plaintiff's employment with the football team and retaliation suffered following her report of harassment. On June 4, 2007, the NYSDHR issued a Final Investigation Report finding probable cause to believe that Plaintiff had been discriminated against.

13.     On or about July 24, 2007, Plaintiff filed a second charge of discrimination with the NYSDHR which was dual filed with the EEOC alleging a second

4

violation of Title VII in relation to the withdrawal of her Graduate Assistantship in the Office of University Relations.

14.     On or about November 28, 2007, Plaintiff received her Notice of Right to Sue from the EEOC in relation to both incidents.  This action has been filed within 90 days of Plaintiff's receipt of her Notice of Right to Sue from the EEOC.

15.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### Fall 2006: A Severe and Pervasive Hostile Work Environment

16.     In May 2006, Plaintiff graduated from Hofstra University with a Bachelor of Arts degree.  Shortly thereafter, she was accepted into Hofstra's Master's Degree Program in Speech Communication and Rhetorical Studies with her course of study scheduled to begin in the Fall of 2006.

17.     Around the same time, Ms. Summa began searching for an on-campus job for the upcoming fall semester and discovered an opening for a position as an Undergraduate Assistant Athletic Manager with the football team.

18.     Ms. Summa discovered the position while browsing online postings for student employment on the University's website.  Ms. Summa was interested in the position because she anticipated needing income during the school year.

19.     At the time of her application for employment in May 2006, the website job posting was requesting applicants from the undergraduate college presumably because the position of football team athletic manager was traditionally filled by undergraduate students.  However, by the time Ms. Summa started her employment, she was enrolled in graduate school.  Since she never signed an employment contract and the

5

school never clarified her employment category, her status as an Undergraduate Assistant employee is presumed for the purposes of the Amended Complaint.

20.     As an avid and lifelong football fan and journalism major, she hoped to make professional contacts and learn the industry of intercollegiate football with an eye towards a career in sports broadcast or print journalism.  Plaintiff applied for the position on or around May 2006.

21.     The posting indicated that her compensation would be a stipend and that employment would last for the entire fall football season and the spring practice season for all NCAA Division 1 and 1-AA football programs which traditionally takes place in April each year (aka "spring ball").

22.     In May 2006, Plaintiff met with Assistant Coach and Offensive Coordinator John Perry for an interview.

23.     Coach Perry informed Ms. Summa of the terms of her employment and offered her the job.  Specifically, Coach Perry informed Ms. Summa that she would work as an Undergraduate Assistant Athletic Manager for the entire football season, including August double sessions, and also for the spring season.  Coach Perry informed Ms. Summa that her compensation would be a $700.00 stipend for the fall football season and a $300.00 stipend for the spring season.  In addition, Ms. Summa would receive subsidized on-campus housing for the month of August and all of her employment related travel and accommodations would be subsidized.  Ms. Summa did not earn academic credit under the terms of her employment.

24.     Shortly after the meeting, Coach Perry confirmed the terms of employment in an email to Ms. Summa.  Ms. Summa replied indicating that she was grateful for the opportunity and enthusiastic about the job.

25.     In early August 2006, Plaintiff reported to double sessions football camp for the first day of her new job.  Ms. Summa met Coach Cohen and was introduced to the coaching staff.

26.     Later, Coach Perry instructed her on her duties for August double sessions.  Ms. Summa was accompanied by one additional Athletic Manager, Ms. Christina Colucci.  Ms. Summa's job responsibilities included setting up the field for each practice, sounding an air horn and calling out five minute intervals during practice, arranging stations for different athletic drills, assisting with recordkeeping, putting away equipment and clearing the field following each practice, and assisting with food delivery and other small tasks in the evening.

27.     With almost every job activity associated with their employment, Ms. Summa and Ms. Colucci were the only women working with and among the football team and staff.

28.     At the time, Ms. Summa was dating a Hofstra football player, Mr. Philip Hall.  During the month of August, Ms. Summa lived in the same dorm as the other players, including Mr. Hall.  As a result of living in close quarters, other players gradually learned that the pair was dating.

29.     During the month of August, other players commented on Ms. Summa's relationship with Mr. Hall, often joking that the pair made an odd couple and commenting on Mr. Hall's lack of suitability for Ms. Summa.

30.     In addition to harassing Ms. Summa for dating Mr. Hall, other players also singled her out as a target for sexual propositions.  During practice, these players would leer at Ms. Summa and Ms. Colucci, asking if they had boyfriends or asking for their phone numbers.

31.     Throughout the season, Ms. Summa received positive feedback from Defendant Cohen during practice.  After practice, he would tell Ms. Colucci and Ms. Summa to "keep up the good work" or "nice job" as they left the field.  The other coaches also frequently commented on Ms. Summa's hard work on behalf of the team.  Ms. Summa made many sacrifices for the sake of her employment on the team, often arriving at work early and working late to meet her many obligations.

32.     On Fridays before away games, she would sacrifice time normally spent studying in order to attend walk through practices with the team and assist with travel preparation.  At all times, Ms. Summa handled her job with the highest degree of professionalism, capability and ethical integrity.

33.     The first game of the season was an away game against Stony Brook University on August 31, 2006.

34.     Ms. Summa's game day responsibilities included preparing the locker room and field for the game, keeping records and statistics during the game, and assisting with clean up and other matters following the conclusion of the game.

35.     As a part of her job responsibilities during away games, Ms. Summa was required to travel with the team, hand out boxed lunches and attend to other small matters.  During away games, she was usually the only woman riding on one of three

8

chartered buses.  Members of the coaching staff were dispersed between the three buses to keep order among the players.

36.     Ms. Summa was the subject of relentless sexual harassment during every bus trip that she made in the 2006 season.  Often, Ms. Summa would sit in the seat in front of Mr. Hall on the team bus, a fact that created a steady stream of harassing comments from other players.

37.     Players would often ask Ms. Summa why she wasn't kissing her boyfriend or holding his hand in an effort to demean Ms. Summa and emasculate Mr. Hall.  On other occasions, players would comment on Ms. Summa's relationship with Mr. Hall by stating, "Why are you with him?" or "If you want to be with a real man, come sit with me."  As detailed below, the hostility of the players steadily increased over the course of the season.

38.     During the week that preceded the Towson University game on September 23, Plaintiff was informed by Mr. Hall that other football players had created a webpage on facebook.com which mocked Ms. Summa.  Ms. Summa viewed the webpage which was located on the facebook webpage belonging to football player Justyn Davis.

39.     The webpage contained a forged federal fugitive warrant and a forged missing person poster that had been created by using images from the Federal Bureau of Investigation's ("FBI") website.  The wanted poster featured a picture of Ms. Summa, taken without her consent from her own webpage, and indicated that she was wanted for Custody Deprivation for kidnapping Phillip Banks aka Phillip Hall.

40. Mr. Hall's nickname among football players was Philip Banks, a reference to a character on the television show "The Fresh Prince of Bel-Air" which aired during the 1990's.

41. The webpage appeared to have been created on or about September 18, 2006. The forged wanted poster referred to Ms. Summa as "extremely dangerous" and urged viewers to "please contact the proper authorities" if anyone confronted her. Ms. Summa's aliases on the poster were listed as "Miss Piggie, The "Wannabe" Big Boss Man, F.B. Manager." Elsewhere on the poster, it states:

> Lauren is currently posing as an active member of the Hofstra University Football team Managerial Staff. Lauren has a tendency to "BOSS" people around without any type of authority.

The missing person poster contained a picture of Mr. Hall and stated "Victim – Philip Banks." The poster listed Mr. Hall's weight as "285 pounds (at the time of his disappearance, weight may have fluctuated because of deprivation of food and excessive sexual activities)," the latter statement being an obvious reference to Ms. Summa.

42. Ms. Summa was outraged and offended by the posting. The posting was intentionally demeaning and sexist, implying that Plaintiff was beastly, overweight, hypersexual, and overbearing.

43. On or around the weekend of the Towson University game, Ms. Summa made an in-person complaint about the posting and other harassing behavior of the football players to Defendant Cohen. Defendant Cohen, who appeared to be annoyed by the fact of Ms. Summa's complaint, offered to speak with the players who posted the forged posters, but did not offer to address the entire team.

10

44.     Upon information and belief, the offending players were never disciplined for posting the offensive materials and the equal employment office was never contacted. Predictably, the harassment continued.

45.     On September 29, Plaintiff flew to Virginia with the team for an away game against the College of William and Mary.  The return trip on September 30 was via bus.  Plaintiff rode with the team and again sat in front of Mr. Hall.  During the ride, the players again harassed Ms. Summa.

46.     As the trip progressed, the comments from other players grew more threatening and harassing and Ms. Summa began to fear for her safety.  At one point, a player suggested that Ms. Summa have sex with Mr. Hall on the bus.  Another player stated that, in his opinion, women shouldn't be athletic managers because they know nothing about sports.

47.     As the comments grew more pointed and aggressive, Ms. Summa addressed the players and firmly asked them to stop.  Afterwards, when Plaintiff used the bus bathroom, players made comments as she was leaving the bathroom stating, "Lauren just blew up the bathroom," and made offensive gestures and comments suggesting that Ms. Summa "stunk up the bus."

48.     On October 13, Plaintiff rode on the team bus to another away game against the University of Delaware.  During the return trip on October 14, Plaintiff was again subjected to relentless, unrestrained and escalating harassment at the hands of players.  At one point, Plaintiff used the bathroom on the team bus and was barricaded inside by players on the team who Plaintiff could hear laughing.

11

49.     Terrified and upset, Plaintiff demanded that the players release her from the bathroom.  The players eventually released her from the bathroom and continued to laugh as she returned to her seat.  The incident, like every incident that took place on the team bus, was loud enough for all on the bus to hear including the coaches at the front of the bus.

50.     As she returned to her seat, Ms. Summa felt intense embarrassment and anger.  Ms. Summa believed that she had again been singled out for ridicule due to her gender.

51.     The harassing conduct culminated with yet another act of sexual harassment on the bus home from the final game of the season against the University of Massachusetts.  Assistant Coach John Perry put on a movie for the team to watch during the trip.  The movie contained numerous sexually graphic scenes.  The players on the bus began shouting and yelling whenever a sex scene aired.  Plaintiff felt offended by both the film and the conduct of the other players.  As the only woman on the bus, Plaintiff grew concerned for her safety.

52.     In one particular scene in the movie, a female Caucasian character removed her clothing and began masturbating in the presence of a male African-American character.  When this scene aired on the bus, a number of African-American players began shouting and yelling obscenities.  An African-American player, Eric Taylor, turned towards Ms. Summa and stated, "This is what you white women want, our black dicks.  This shit makes you crazy."  Offended, scared and humiliated, Plaintiff began crying.  She approached Coach Perry and asked him to turn off the video.  Coach Perry complied and told the players to sit down but failed to discipline Mr. Taylor and

12

made no indication that he would relay the incident to Coach Cohen or otherwise follow up on the matter.

53.     The players responded by protesting, shouting for Coach Perry to play the video and yelling, "We want boobies."  Mr. Taylor, outraged by Ms. Summa's complaint, leered at Ms. Summa in a threatening fashion and said, "Sit down and shut the fuck up."

54.     On this and every occasion that Ms. Summa was harassed on the bus, a member of the coaching staff was seated within two rows of her.  Upon information and belief, Hofstra coaches were able to hear each of the harassing comments which took place on the team bus and failed to respond promptly.  Also, other male players were never the subject of similar harassing ridicule of this severity.

55.     When the bus arrived back at Hofstra, Plaintiff got off the bus and immediately informed Defendant Cohen of what had taken place during the trip. Defendant Cohen again appeared irritated by Ms. Summa's complaint.

56.     Ms. Summa informed Defendant Cohen that she had had enough of the harassing behavior of the football players and that she was going to report the most recent incident to Campus Safety.  This only irritated Defendant Cohen more and caused him to urge Ms. Summa to refrain from reporting the incident since it was "not serious" and would only draw unneeded attention to the football program.   Considering Defendant Cohen's nonexistent commitment to following through on Ms. Summa's complaints, Ms. Summa ignored his advice and reported the incident to campus security that evening, hoping that more accountability would result.

57.     Later that night, Ms. Summa emailed Dean of Students Lynda O'Malley and reported the entire history of harassment that she had suffered on the football team.

The next day, Ms. O'Malley met with Ms. Summa and advised her to speak with Maureen Murphy, Hofstra's Equal Employment Officer.

58.     A short while later, Ms. Summa contacted Maureen Murphy who informed Ms. Summa that an investigation was underway. Ms. Murphy told Ms. Summa that she had had recurrent problems with the men's athletic teams and that whenever she attempted to schedule sensitivity training, she was informed by the coaching staff that they did not have time for training. Ms. Murphy informed Ms. Summa that she planned on scheduling sensitivity training with the entire athletic department in the near future. Upon information and belief, to date, the training has not taken place.

59.     Defendant Cohen contacted Ms. Summa shortly after her conversation with Ms. Murphy. In a phone conversation, Defendant Cohen informed Ms. Summa that he was unhappy that Ms. Summa had reported the incident to public safety.

60.     Defendant Cohen then informed Ms. Summa that Eric Taylor had been kicked off the team, but not as a result of her report. He had outstanding disciplinary problems that resulted in his expulsion from the team.

61.     After the season, Ms. Summa was contacted by the Dean of Students office. When Ms. Summa requested to make a statement at Mr. Taylor's disciplinary hearing, she was informed that the hearing had already taken place and that Ms. Summa did not have a right to be present or even learn of the results of the proceeding due to student privacy laws. Ms. Summa was not allowed to submit any materials for the disciplinary hearing or participate in any manner. The Dean of Students informed Ms. Summa that Mr. Taylor was required to write a letter of apology as a part of his disciplining. The next month, Ms. Summa received a hand written, three-sentence letter

14

of apology from Eric Taylor apologizing for the "supposed comments" he had made.  He

signed the letter "Former Hofstra University Football Player Eric Taylor."

62.     Not surprisingly, the harassment continued following the football season

and despite the University's meager responses to Plaintiff's complaints.  On February 14,

2007, Plaintiff was in the student center when she was approached by Mr. Taylor, Ms.

Tanya Allen, and a number of unidentified female students.  Mr. Taylor, in a threatening

tone, told Ms. Summa that he had been kicked off the football team as a result of her

report of harassment.  He stood in her path along with the other students in an

intimidating fashion.  Ms. Summa walked around the students and hastily walked out of

the student center.  Mr. Taylor and the other students followed her.  As they were

following her, Ms. Allen yelled out to Ms. Summa stating that she had caused "her man"

trouble and that she was going to "kick (her) ass."  Terrified, Plaintiff ran to the public

safety building and reported the threat.  Shortly thereafter, Plaintiff reported the incident

to Ms. Murphy's office.

63.     A representative from Ms. Murphy's office contacted Ms. Summa and told

her that the office had received her complaint and that she should contact Public Safety if

she had any further problems with Mr. Taylor.  The representative made no mention of

further disciplinary proceedings against Mr. Taylor and, upon information and belief,

none were initiated.

64.     Despite Plaintiff's high level of performance and dedication as a student

employee, she has been subjected to a continuing pattern of gender discrimination and

harassment at the hands of other students and with the full knowledge of Hofstra's

football coaches and, later, Equal Employment Opportunity Officer and Dean of

15

Students, all of whom possessed the ability to make it end but failed to assert sufficient authority to do so.

65.     This sexual harassment was unwelcome, severe and pervasive and created an offensive, hostile work environment for Lauren Summa.  Ms. Summa repeatedly complained internally and asked her supervisors to stop Eric Taylor and the football players from abusive, discriminatory conduct, to no avail.  The harassment continued even after the football season had ended and even after Mr. Taylor had issued his hollow and meaningless apology.

66.     Unfortunately, Hofstra's weak commitment to protecting Ms. Summa against harassment and discrimination, likely the result of the football coaches' hostile resistance to enforcing anti-discrimination policies and adverse relationship with the Equal Employment Office, was just the beginning of the University's failure to uphold Federal and New York State anti-discrimination laws.

**Ms. Summa is Retaliated Against in May 2007**

67.     Spring practice was scheduled to start on Monday, March 26, 2007.  On Friday, March 23, 2007, Plaintiff called the football office and left a message for Cathy Aull, a secretary in the football office, requesting a copy of the schedule for the spring practice season.  Ms. Aull never returned Ms. Summa's call.  On Sunday, March 25, 2007, one day before spring practice was scheduled to begin, Defendant Cohen called Ms. Summa.  The phone call was disconnected before Ms. Summa was able to determine the purpose of the call.

68.     Shortly afterwards, Defendant Cohen sent Ms. Summa an email indicating that he had given her position to another employee and that Ms. Summa no longer had a

job. Defendant Cohen explained that since he had not heard from Ms. Summa until the Friday before practice was scheduled to begin, he assumed that she was no longer interested in the job.

69. For any one of a number of reasons, Defendant Cohen's explanations for retaliating against Ms. Summa were transparently pre-textual. Throughout Ms. Summa's fall employment with the football team, Coach Cohen made repeated comments about Ms. Summa's expected return as an Assistant Athletic Manager for the spring practice season.

70. On one occasion, Defendant Cohen inquired with Ms. Summa about whether or not she would be returning for a second year of graduate school. Defendant Cohen indicated that Plaintiff could keep the job for a second year if she wished, an offer that essentially extended her employment for another year.

71. Also, Ms. Summa asked Defendant Cohen at one point if he would be willing to give her more responsibilities so she might qualify for tuition assistance. Defendant Cohen responded that he could not increase her salary given the restrictions on his budget, but reassured her that he could ensure her continued employment as an Assistant Athletic Manager for the foreseeable future. Moreover, current and former Assistant Athletic Managers have never had to renew their application for Assistant Athletic Manager positions or provide any notice at the beginning of any given football season, whether spring or fall.

72. Custom allowed for Assistant Athletic Managers to return to work on the first day of spring practice without calling the coaches in advance to announce their return. Even if notice or reapplication was expected, and clearly they were not,

17

Defendant Cohen had already hired Ms. Summa's replacement before Friday, March 23, 2007 and, in all likelihood, well before any Assistant Athletic Manager would ever be expected to call the Coach and confirm her return to the position.

73.     That Monday, Ms. Summa contacted the Athletic Department requesting her job back. A representative from the Athletic Department returned her phone call and, during the discussion, confirmed that her job was no longer available. After repeatedly failing in her attempts to rectify Hofstra's consistent failure to enforce anti-discrimination laws, Ms. Summa decided to file an external complaint with the EEOC and the NYSDHR alleging gender discrimination and retaliation. Ms. Summa filed her Charge on May 3, 2007. On June 4, the NYSDHR issued a probable cause determination following the conclusion of an investigation.

74.     Upon information and belief, Defendant Cohen remains Head Football Coach and has suffered no discipline as a result of failing to remedy harassment or committing acts of retaliation.

**Ms. Summa is Retaliated Against in July 2007**

75.     After losing her job with the football team, Ms. Summa began looking for alternative employment for the school year. On April 24, 2007, prior to filing her Charge with the NYSDHR, Ms. Summa responded to a posting on the Hofstra University web site for a Graduate Assistantship in the Office of University Relations. The add solicited applications from accepted, matriculated graduate students enrolled in a Hofstra University graduate degree program. Compensation consisted of an 18 credit tuition waiver for graduate courses and the period of employment was from September 4, 2007 – May 16, 2007.

18

76.     Ms. Summa contacted Ms. Helen Stefanidis, Director of Marketing Planning and Operations, and expressed an interest in the position and offered to email her resume.  Ms. Stefanidis encouraged Ms. Summa to apply and offered to review her resume.  Later, after having reviewed Ms. Summa's resume, Ms. Stefanidis called Ms. Summa with questions about her experience and, after Ms. Summa had clarified her resume, offered her an interview.  When Ms. Summa offered to send a second resume clarifying the matters Ms. Stefanidis found confusing, Ms. Stefanidis insisted that it wasn't necessary and encouraged Ms. Summa to interview for the position.

77.     The next week, Ms. Summa met with Ms. Stefanidis and interviewed for the position.  The interview went well and Ms. Stefanidis informed her that she would be contacted for another round of interviews if her application advanced.  A few days later, she was contacted by the office for a second round of interviews with Stuart Vincent, Assistant Vice President for University Relations, and Lindsay Calabrese, Assistant Director of Public Relations.  As with the interview with Ms. Stefanidis, the interview went smoothly and Ms. Summa was informed that she would be contacted shortly with a decision.

78.     A few days later, in mid-May, Ms. Stefanidis contacted Ms. Summa and offered her the job.  Ms. Summa immediately accepted the position.  Ms. Summa asked about paperwork she would be required to fill out for financial aid purposes and Ms. Stefanidis informed her that her office would submit the paperwork on her behalf.  Ms. Summa exchanged emails with Ms. Stefanidis and others in the office discussing paperwork approval and other matters which clearly reflected Ms. Summa's status as a newly hired employee.

19

79.    Meanwhile, Ms. Summa's NYSDHR Charge, which was filed on May 3 but wasn't sworn until May 9, was served on Hofstra on or near the date of Ms. Summa's offer of employment.

80.    In early July, after Ms. Summa's NYSDHR Charge had been served, Ms. Summa was contacted by a representative from University Relations.  She was informed that she needed to meet with the Vice President, Ms. Melissa Connolly, to discuss the position.  Assuming that the meeting was a courtesy, Ms. Summa met with Defendant Connolly on July 19.  During the meeting, Defendant Connolly explained the structure of the office and her expectations for the position.  She inquired about Ms. Summa's resume and Ms. Summa replied that she had answered the same questions when Ms. Stefanidis interviewed her two months ago.  At the conclusion of the meeting, Ms. Summa told Defendant Connolly that she looked forward to working for her and was enthusiastic about starting in September.

81.    The next day, Ms. Stefanidis called Ms. Summa.  Ms. Stefanidis rescinded the offer of employment due to the alleged problems with her resume.  Astounded, Ms. Summa informed Ms. Stefanidis that she had raised the issues with her prior to her hiring and Ms. Stefanidis indicated that it was not a concern.  Ms. Stefanidis failed to provide an explanation that satisfied Ms. Summa at which point Ms. Summa demanded to speak with Defendant Connolly.  Ms. Stefanidis refused to provide Defendant Connolly's phone number.

82.    Ms. Summa got Defendant Connolly's phone number from the campus operator and called her directly.  Defendant Connolly failed to answer the phone and Ms. Summa left a message.  Ms. Summa waited 10 minutes and called Defendant Connolly

again from a caller-ID restricted phone.  This time, Defendant Connolly picked up.

Defendant Connolly informed Ms. Summa that she would not be hired because of the

alleged problems with her resume and because she lacked experience.  Incredulous, Ms.

Summa asked why she had been hired in the first place if she lacked the appropriate

experience and Defendant Connolly could not provide an explanation.  When Ms.

Summa demanded her job back, Defendant Connolly informed Ms. Summa that she was

the decision maker and that Ms. Summa would not be getting her job back.   Defendant

Connolly ended the conversation abruptly and referred Ms. Summa to Roberta Frisch in

the office of Student Employment for any further complaints.  Ms. Summa called Ms.

Frisch and was told that she was out of the office and would not be returning for a week.

83.     On information and belief, the University's Legal Counsel's office is

located across the hall from the University Relations office.  Due to the nature of their

work, the University Relations staff and Legal Counsel's office frequently work on

projects which overlap.  Furthermore, upon information and belief, Ms. Summa's filing

with the NYSDHR resulted in a flurry of internal emails, interviews and investigation

related to Ms. Summa's history as a student and an employee at the University.

84.     The timing of Ms. Summa's rescinded offer of employment and the

excuses offered for rescinding her offer of employment suggest a single conclusion; the

Public Relations office and Defendant Connolly retaliated against Ms. Summa only after

learning of the filing of her May 3 Charge of Discrimination.  Hofstra University's

second act of retaliation against Ms. Summa, committed just two months after the prior

incident, is as transparent and pre-textual as Hofstra's first act of retaliation against Ms.

Summa.

85.     It is preposterous to think that Ms. Summa was prepared to falsify her undergraduate academic record in applying for a job at the same undergraduate institution that provided her education and retains her academic records. Moreover, Ms. Summa was offered the job after her interviewers were made aware of the alleged problems with her resume and had the opportunity to question and contemplate her fitness for employment. Ms. Summa explained the alleged controversial entries on her resume to every person that interviewed her, including Ms. Stefanidis, and provided a reasonable explanation that was accepted as truthful by each interviewer. Hofstra's explanation for Ms. Summa's rescinded offer of employment simply does not pass the test of reason.

86.     It is inconceivable that any professional work environment with a meaningful commitment to enforcing anti-discrimination laws would ever tolerate any single act alleged in this Amended Complaint. Instances of female employees barricaded in bathrooms, subjected to blatantly sexist harassment and insults, and forced to watch sexually offensive videos are each instances of conduct which would independently be considered abhorrently objectionable and unlawful in most professional work environments, never mind the two subsequent acts of retaliation committed by the same employer.

87.     Yet because of Ms. Summa's status as a faceless and youthful female student employee in the male-dominated culture of NCAA college football, the University was able to devalue her contributions to the point where she was actively advised by her supervisors that this conduct was "not a big deal." It is impossible to imagine that the same attitude would be adopted if Ms. Summa had been the starting quarterback on the football team and was subjected to similar degrading treatment.

22

88.     While the University has already cited Mr. Taylor's expulsion from the football team as proof of a rapid response to Ms. Summa's complaint, this fix amounted to little more than window dressing.  Mr. Taylor was a single actor in a culture of discrimination.  The hostile environment created by the football players and condoned by the coaches did not cease to exist after Mr. Taylor's expulsion; the season simply ended thereby creating fewer opportunities for further unlawful conduct.  Even with the end of the football season, Hofstra was still unable to prevent Mr. Taylor from harassing Ms. Summa.  Had Ms. Summa returned in the spring, the harassment would have been even more severe, a fact Defendant Cohen likely took into consideration before retaliating against her.

89.     Hofstra University's deliberate indifference to Lauren Summa's complaints encouraged a pre-existing rogue and sexist culture among Hofstra's football players.  Hofstra's football players are allowed to break the law with abandon presumably because they are valuable assets on a revenue producing men's athletic team.

90.     As evidence of this, Hofstra's equal employment and anti-discrimination officers failed to comply with their own internal Harassment Policy in conducting an investigation of Ms. Summa's complaint.  However, the actions of Hofstra's Equal Employment Office was just part of Hofstra's deliberate indifference towards Ms. Summa's treatment; Defendant Cohen and the football coaches deliberately ignored the taunting of Ms. Summa by other players on the team bus which occurred throughout the season, played an offensive and sexually explicit videotape in her presence, failed to discipline players who posted sexist materials about Ms. Summa on their website, and retaliated against her after she complained about the conduct.  Since Ms. Summa's

23

complaint threatened the future prospects of a number of young players, including regular contributors to the team, the football program and the University as a whole responded in a self protective fashion by symbolically disciplining a single player with a pre-existing history of disciplinary problems.  As a result, Defendant Cohen and Defendant Connolly were free to retaliate against Ms. Summa, who had been left without protection by the University following her complaints.

91.     The underlying culture of sexism and harassment was never addressed and, following the hollow disciplining of Mr. Taylor, even he was allowed to continue harassing Ms. Summa.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Title VII)

92.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 91, inclusive, as if fully set forth herein.

93.     Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex in violation of Title VII by denying to her equal terms and conditions of employment, including but not limited to subjecting her to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful harassment.

94.     Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex in violation of Title VII by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff.

24

95.     As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

96.     As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

97.     Defendant Hofstra University's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Retaliation in Violation of Title VII)

98.     Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 97, inclusive, as if fully set forth herein.

99.     Defendant Hofstra University has retaliated against Plaintiff in violation of Title VII for her opposition to discriminatory practices directed toward her and other female employees.  Defendant Hofstra University committed at least two independent acts of retaliation as alleged above.

25

100.    As a direct and proximate result of Defendant Hofstra University's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

101.    As a direct and proximate result of Defendant Hofstra University's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

102.    Defendant Hofstra University's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Discrimination and Harassment in Violation of Title IX)

103.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 102, inclusive, as if fully set forth herein.

104.    Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex in violation of Title IX by excluding Plaintiff from participation in, denying Plaintiff the benefit of, and subjecting Plaintiff to discrimination under Hofstra's programs or activities.

105.   Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex in violation of Title IX by creating, fostering, condoning, accepting, ratifying and/or otherwise exhibiting deliberate indifference to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff by other students.

106.   As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of Title IX, Plaintiff has suffered and continues to suffer monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

107.   As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of Title IX, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

108.   Defendant Hofstra University's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title IX for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Retaliation in Violation of Title IX)

109.   Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 108, inclusive, as if fully set forth herein.

110.    Defendant Hofstra University has retaliated against Plaintiff in violation of Title IX for her opposition to discriminatory practices directed toward her and other female students.

111.    As a direct and proximate result of Defendant Hofstra University's unlawful retaliatory conduct in violation of Title IX, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

112.    As a direct and proximate result of Defendant Hofstra University's unlawful retaliatory conduct in violation of Title IX, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

113.    Defendant Hofstra University's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title IX for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Discrimination and Harassment in Violation of New York State Human Rights Law)

114.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 113, inclusive, as if fully set forth herein.

115.    Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex in violation of the New York State Human Rights Law by denying to her the equal terms and conditions of employment, including but not limited to subjecting her

to disparate working conditions and denying her the opportunity to work in an employment setting free of unlawful harassment.

116.   Defendant Hofstra University has discriminated against Plaintiff on the basis of her sex, in violation of the New York State Human Rights Law by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff.

117.   As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

118.   As a direct and proximate result of Defendant Hofstra University's unlawful discriminatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Retaliation in Violation of New York State Human Rights Law)

119.   Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 118, inclusive, as if fully set forth herein.

120.    Defendants have retaliated against Plaintiff in violation of the New York State Human Rights Law for her opposition to discriminatory practices directed toward herself and other female employees, and/or her participation in lodging complaints about such discriminatory practices toward herself and other female employees.

121.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

122.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the New York State Human Rights Law, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Violations of New York State Human Rights Law)

123.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 122, inclusive, as if fully set forth herein.

124.    Defendant Cohen knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

125.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss of past and

30

future income, compensation and benefits for which she is entitled to an award of damages.

126.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Violations of New York State Human Rights Law)

127.    Plaintiff hereby repeats and realleges each and every allegation in paragraphs 1 through 126, inclusive, as if fully set forth herein.

128.    Defendant Connolly knowingly or recklessly aided and abetted the unlawful employment practices, discrimination, harassment and retaliation against Plaintiff in violation of the New York State Human Rights Law.

129.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of damages.

130.    As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect her employment and personal life;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

G.     An award of damages for any and all other monetary and/or non-monetary

32

losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment

interest;

        H.      An award of punitive damages;

        I.      An award of costs that Plaintiff has incurred in this action, as well as

Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

        J.      Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
        February 15, 2008

                Respectfully submitted,

                THOMPSON WIGDOR & GILLY LLP

                By: _____

                    Douglas H. Wigdor (DW-9737)
                    Christopher Q. Davis (CD-7282)
                    350 Fifth Avenue, Suite 5720
                    New York, NY 10118
                    Telephone: (212) 239-9292
                    Facsimile: (212) 239-9001

                    COUNSEL FOR PLAINTIFF