UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LAUREN E. SUMMA,

               Plaintiff,                 **MEMORANDUM & ORDER**

        -against-                   CV 08-0361 (WDW)

HOFSTRA UNIVERSITY, DAVID COHEN, and
MELISSA CONNOLLY in their individual and
official capacities,

               Defendants.
------------------------------------------------------------------X
**APPEARANCES:**
Thompson Wigdor & Gilly LLP
85 Fifth Avenue
New York, New York  10003
Douglas H. Wigdor, Esq. and Cindy E. Uh, Esq., Attorneys for Plaintiff

Farrell Fritz, P.C.
1320 RXR Plaza
Uniondale, New York 11556
Domenique Camacho Moran, Esq. and Michael A.H. Schoenberg, Attorneys for Defendants

**WALL, Magistrate Judge:**

     Before this court, on consent of the parties, is a motion for summary judgment by

defendants Hofstra University ("Hofstra"), David Cohen, and Melissa Connolly.  *See* Docket

Entry ("DE") [36].  Plaintiff Lauren Summa has opposed the motion.  For the reasons set forth

herein, defendants' motion for summary judgment is granted in its entirety.

**BACKGROUND**

     The material facts, drawn from the Second Amended Complaint and the parties' Rule

56.1 Statements, are undisputed unless otherwise noted.  Plaintiff is a former undergraduate and

graduate student at Hofstra, having received a Bachelor of Arts degree in Broadcast Journalism

in May 2006 and a Master of Arts degree in Speech Communication and Rhetorical Studies in

May 2009. Defendants' Rule 56.1 Statement ("Defs. Stmt") ¶¶1-3, DE [37]. Defendant Melissa Connolly is the Vice President of the Office of University Relations at Hofstra. Defendant David Cohen is the head coach for the Hofstra football team. Although the parties dispute exactly when Cohen started in this position at Hofstra, *compare* Defs' Stmt ¶4 *with* Plaintiff's Rule 56.1 Statement ("Pl. Stmt") ¶4, DE [40], there is no dispute that he was the head coach during the events underlying this litigation.

In early 2006, plaintiff began dating Phillip Hall, a member of Hofstra's football team. In or about May 2006, plaintiff saw a posting for a position as a student manager for the football team and sometime thereafter applied for the position. Plaintiff was interviewed for the position by an assistant coach, John Perry, and accepted an offer to take the position. According to plaintiff, Perry told her the position was for fall 2006 and spring 2007. Summa Dep. 167. Plaintiff supports her contention that the position was for both fall and spring with an e-mail dated September 13, 2006 from the secretary of football, Cathy Aull, to someone named Cindy Lewis indicating that football managers were paid a stipend of "$700 now, $300 in the spring." Wigdor Decl., Ex. 9.

Plaintiff attended the team's training camp in August 2006. She claims that during training camp, comments were made about plaintiff's relationship with Hall to the effect "[t]hat he wasn't good enough for me; that we made an odd couple. Things of that nature." Summa Dep. 184. She also testified that on the return bus trip from the Stony Brook game, which according to the schedule took place on August 31st, additional comments were made about her relationship with Hall: "there were players that were making comments about, you know, why are you with him? If you want to be with a, you know, real man, come sit over here with me.

And making jokes about the relationship again. And singling me out for being the only female on the bus." *Id.* at 193-94. It is undisputed that plaintiff did not report any incidents of alleged harassment until September 24, 2006.

On September 24th, plaintiff, along with Phillip Hall's mother, met with Cohen to discuss a posting on Facebook. At this meeting, plaintiff also advised Cohen for the first time that she had previously been the subject of harassment by the players by way of "comments that had been made on the bus and . . . during camp." Summa Dep. 217. Contrary to plaintiff's assertion, Cohen testified that the Facebook page was the only incident discussed at this meeting. Cohen Dep. 195.

The Facebook issue concerned a posting on the page of a player, Justyn Davis, that consisted of a series of photographs of plaintiff and of Phillip Hall, who some players apparently referred to as "Phillip Banks." The gist of the posting was that plaintiff had "kidnapped" Hall. One photograph of Hall was captioned in part "We have lost one of our dear friends, Phillip Banks. . . It is URGENT THAT WE FIND THIS MAN!!!!" Defs. Ex. M. A second photograph of Hall was headed by a statement that read in part that a "warrant for custody deprivation was issued for the search of Phillip Banks," contained personal information regarding Hall, and was "signed" by the Federal Bureau of Investigation. *Id.* The personal information included a listing of Hall's weight as "285 pounds (at the time of his disappearance, weight may fluctuate because of deprivation of food and excessive sexual activities)." *Id.*

One photograph of plaintiff was posted twice on Davis's Facebook page. One page had plaintiff's photograph as part of a "Wanted for Kidnapping" poster, which referred to her as "Missy Piggie" and had additional text warning people not to approach plaintiff and calling her

3

"Extremely Dangerous!!" *Id.* The second page was headed "Wanted by the FBI," listed Summa's name, along with "aliases" of "Miss Piggie, the 'Wannabe' Big Boss Man, F.B. Manager" and some personal information. *Id.* She is described as "currently posing as an active member of the Hofstra University Football Team Managerial Staff" and "has a tendency to 'BOSS' People around without any type of authority." *Id.*

Cohen told plaintiff and Hall's mother that he would speak with the players about the Facebook posting. According to defendants, Cohen spoke individually to the student-athletes involved with the posting on September 25th and directed them to remove the material. Defs. Stmt ¶21. Plaintiff agrees that the posting was removed "a short time after" the September 24th meeting, Summa Dep. 222, but notes that Cohen did not report the incident to the University or the EEO office, nor did he discipline the players. Pl. Stmt ¶21.

On the bus ride after the game at the College of William & Mary on September 30, 2006, plaintiff testified that "there was a comment made about, you know, women shouldn't be managers because they don't know anything about sports. And a reference that, you know, Phil and I should be engaging in sex on the bus. And I also went to use the bathroom and someone had made a reference to Lauren stunk up the bathroom." Summa Dep. 224-25. When asked whether she reported those comments, plaintiff responded "[n]ot that I recall at this time." *Id.* at 229. Plaintiff also could not identify the speaker of either the "women shouldn't be managers" comment, *id.* 225, or the bathroom comment. *Id.* at 228.

On the bus ride back from the University of Delaware on October 14, 2006, plaintiff claims that she was "barricaded in the bathroom by some players" and that she could "hear them laughing and they were holding the door shut." Summa Dep. 229-30. She could not hear what

they were saying, she could not identify who the players were, *id.* at 231, and when asked if she

reported this incident at the time it occurred, plaintiff responded "I'm not certain at this time."

*Id.* at 232.

Subsequent to her meeting with Cohen regarding the Facebook posting, she did not

complain "to Cohen or the University about any other incidents of alleged sexual harassment or

alleged inappropriate conduct until November 18, 2006." Defs. Stmt ¶23.

**The Incident of November 18, 2006**

On November 18, 2006, plaintiff was on a team bus returning from the University of

Massachusetts, the final game of the season. During the trip, Coach Perry played a tape of the

movie "*Shadowboxer*." Pl. Stmt ¶25. Plaintiff testified as to what occurred as the movie played:

> there were numerous sex scenes that continued to be more graphic
> in nature. And players making lewd comments and howling and
> talking about how they wanted to get laid and oh, nice tits. And
> then there was a particular scene that was shown where a white
> woman was masturbating to a black man who was in the shower.
> And this player, Eric Taylor, turned around in his seat and said to
> me, this is what you white women want, our black dicks. That shit
> will make you go crazy. And then everyone started laughing. And
> I just burst into tears and crying. And I was humiliated and
> embarrassed and upset.

Summa Dep. 235. Plaintiff went to the front of the bus, complained to assistant coach Perry, and

asked him to turn it off. Plaintiff admits that Perry immediately turned the movie off. According

to plaintiff, the players were chanting "we want boobies" and asking for the movie to be turned

back on as she returned to her seat. *Id.* at 236. Additionally, Eric Taylor told her to "sit down

and like shut the fuck up." *Id.* Perry then instructed the players to be quiet, *id.*, and stood by

plaintiff for the remaining 10 to 15 minutes of the trip. Perry Dep. 64.

There is no dispute that plaintiff reported the incident to Cohen, who was on a different bus, as soon as the buses arrived at Hofstra.  According to plaintiff, as she presented her complaint, Cohen "appeared irritated and looked like he wanted to, like, remove himself from the conversation and go somewhere else."  Summa Dep. 239.  She says that she told him that she "had enough of this harassment" and that she "was tempted to report this to public safety."  *Id.* at 238.  According to plaintiff, Cohen told her that reporting the incident to public safety would draw "attention to the program. And that he would just deal with it later" and would "handle talking to Eric at some point, like Monday or something."  *Id.* at 239-40.  After the conversation, plaintiff and Hall went to public safety to report what had happened.  *Id.*; Dep't of Public Safety complaint of 11/18/06, Wigdor Decl. Ex. 17.   Summa's statement to public safety referenced only the bus incident of November 18th.

After speaking with plaintiff, Cohen spoke with Perry by phone immediately, Cohen Dep. 40-41, and spoke with Eric Taylor and two or three other players on Sunday.  *Id.* at 38.   By Sunday evening, Cohen had made the decision to terminate Taylor from the football team.  *Id.* at 31.  The November 18th incident was the "final straw" that, in addition to two other incidents involving academic deficiency and a fraternity hazing incident, resulted in Taylor's dismissal from the team.  *Id.* at 31-32.  Within 48 hours of the incident, Cohen had alerted his supervisors and reported his findings.  *Id.* at 26-30.  Cohen called plaintiff on Monday night to tell her that Taylor would no longer be on the team.  *Id.* at 39.  He testified that when he called plaintiff on Monday night, he was unaware that she had filed a complaint with public safety.  *Id.*

As a result of the complaint to public safety, Hofstra convened an Administrative Hearing Board to address Summa's charges against Taylor on December 7, 2006.  Although charged with

6

harassment and verbal abuse, Taylor was held responsible only for verbal abuse and was placed on disciplinary warning and mandated to write a letter of apology to plaintiff. Although plaintiff was sent a letter notifying her of the hearing, she did not receive it until after the hearing had already been held.

In addition to filing her complaint with public safety on Saturday night, plaintiff also that evening sent an e-mail to Lynda O'Malley at the Dean of Students' Office explaining "what had happened, that there were other incidents that had happened." Summa Dep. 246. Plaintiff did not recall whether she had contacted O'Malley previously to discuss the situation with the football team. *Id.* at 247-48. She met with O'Malley on the Monday following the University of Massachusetts bus trip at which time she told her about the "different harassment" she had experienced, the Facebook incident, and the November 18th bus trip. *Id.* at 249. O'Malley told plaintiff that she should make a complaint to Maureen Murphy, Hofstra's Equality Officer. *Id.*

Summa met with Murphy sometime during the week following the November 18th bus incident. Murphy Dep. 130. Murphy told plaintiff that if she wished to file a report, she should put it in writing. *Id.* at 132. Summa filed such a report, dated November 28, 2006. Wigdor Decl. Ex. 21. The report discusses only the November 18th incident and its aftermath and does not raise any earlier alleged incidents. During Murphy's interview with Summa, prior incidents were mentioned, but Murphy only investigated the November 18th incident as that was the only incident contained in the formal complaint. Murphy Dep. 166-67. Murphy determined that Eric Taylor's comment was a "sexually harassing remark," but as the complaint was a "student-to-student complaint" it was properly referred to the dean of students' office. *Id.* at 143, 177.[1]

---

[1] In contrast, Murphy also noted at her deposition that a comment such as "don't take a poop on the bus" was not sexual harassment. Murphy Dep. 169.

Murphy did, however, interview the witnesses identified by plaintiff.  *Id.* at 140.

As to the coaching staff's handling of the November 18th incident, Murphy testified that while Taylor's remark was a violation, "as soon as the movie was brought to their attention, the athletic staff handled the matter responsibly."  Murphy Dep. 176.  On or about December 18, 2006, Murphy sent her memorandum regarding her findings to the vice president for legal affairs.  *Id.*; Murphy Mem., Wigdor Decl. Ex. 22.  In her report, Murphy noted that the matter "offers an opportunity for educating the coaching staff and all of the Athletics staff about the University's Harassment Policy" and stated she would like to schedule training "this spring."  Wigdor Decl. Ex. 22.  The training was provided in or around August 2007.  Defs. Stmt ¶47.  She also made recommendations regarding the process for selecting movies to be shown on the bus.  Murphy's memorandum makes no mention of any other alleged incident of harassment involving plaintiff.

**Football Team Student Manager position for Spring 2007**

Plaintiff states that at the time she was first interviewed in August 2006, Coach Perry told her that the football team's spring sessions, known as "Spring Ball," would start towards the end of the following March, would last for approximately four weeks, and that she would perform tasks similar to those required during the fall.  Summa Dep. 168.  Plaintiff further claims that Cohen knew she was coming back to work for Spring Ball.  *Id.* at 274.  She references a conversation she had on the practice field "during camp, beginning of September" regarding "expectations" and Cohen "knew that I was going here for the spring, and that I had my second year of graduate school, that he wouldn't have to worry about finding someone in the fall and then the following spring, to continue another year."  *Id.* at 274-75.  Plaintiff testified that she had "two or three" conversations with Cohen about Spring Ball, but was unable to provide any

8

specifics about when or where those conversations took place or what precisely was said.  *Id.* at 275-79.   The record does not reflect any communication whatsoever between plaintiff and the football staff between the end of November 2006 and March 24, 2007.

In or around March 2007, Anthony Battaglia, the team's Equipment Manager hired the previous October, "searched for and selected students who were interest in taking advantage of the student football team manager opportunity for Spring Ball."  Defs. Stmt ¶51.  Battaglia states that at the time he made the selections, he "was unaware that Plaintiff had any interest in returning to the football team as the student football team manager."  Battaglia Aff. ¶4, Moran Decl., Ex. MM.  He further swears that at the time he made the selection for spring ball managers, he was unaware of plaintiff's complaint to the university regarding Taylor.  *Id.* at ¶5.

Spring Ball was scheduled to start on Monday, March 26, 2007.  On Saturday, March 24, 2007, plaintiff left a voicemail message on the main football office number about the start of Spring Ball and to "get the schedule."  Summa Dep. 280-81.  On Sunday, March 25th, Cohen returned her call and left a message stating in part that "we hadn't heard from you so we went and filled . . . the equipment manager position for the spring."  Wigdor Decl., Ex. 23.

The next documented contact occurred by way of e-mails exchanged between plaintiff and Cohen on April 10, 2007, over two weeks after plaintiff was told that the position had been filled.  Plaintiff's first e-mail said that she had been "blown off about reporting to work," and that she had been hired for the entire season including spring ball.  Moran Decl. Ex. T.  Cohen responded "since we had not heard from you until you left a message" on March 24th, and "spring practice was starting on March 25th we filled the position."  *Id.*  Plaintiff responded as follows:

> I made several attempts to continue with my position by contacting
> the office and Coach Perry.  I never got any response until when

> you called me. I feel like I was blown off and my job just given
> away. When I was hired, I was hired to work in the spring too.
> You cannot just give a job away when you knew I was coming
> back to continue. What can we do to solve this problem?

*Id.* Plaintiff scheduled a meeting with Daniel McCabe, Associate Director of Athletics regarding the spring ball football manager position. McCabe indicated he could get plaintiff a position in another department of athletics, but plaintiff told him "I already have a job. I'm supposed to be working for the football team." Summa Dep. 291. Plaintiff did not take another position in the Athletic Department.

**Graduate Assistantship Application**

On or about April 24, 2007, Summa applied for a Graduate Assistantship in the Office of University Relations ("University Relations"). This position was credit bearing and thus needed to be budgeted within the department. Connolly Dep. 110. On May 17, 2007, plaintiff met with Helen Stefanidis to interview for the position. About one week later, she met with two other employees of University Relations. Plaintiff claims that "shortly after" the second interviews, she received a call from Stefanidis in which Stefanidis offered plaintiff the position and plaintiff accepted it. Summa Dep. 313, 317. Plaintiff understood there would be paperwork to complete and that the position would start in September. *Id.* at 314. By e-mail dated June 28, 2007, plaintiff noted that she had been in contact with Kate Scanlon in student employment regarding the proper paperwork. Wigdor Decl., Ex. 39

Connolly, the Vice President of University Relations, testified that there was confusion regarding both the interview process and the paperwork required for this position, as Connolly wasn't, at that time, aware of the requirements for hiring a Graduate Assistant. Connolly Dep.

111, 115.  For example, a signature of a vice president is required on a graduate assistantship as such a hiring affects the department's budget.  Miller-Suber Dep. 38-39.  In late June, Connolly received a phone call from Evelyn Miller-Suber, Hofstra's Director of Human Resources.  At that time, Connolly was advised that, in light of the requirement that she "sign off on the paperwork," she should interview the candidates.  Connolly Dep. 128.  Miller-Suber also clarified what paperwork was necessary to complete the hire.  *Id.*  In addition, Miller-Suber told Connolly that all candidates working in Connolly's office "should be able to represent the University in meetings, represent the University in, with external audiences, and be advocates for the University."  *Id.* at 133-34.  Connolly interpreted this "to mean people who could represent the University with any number of people and represent the University's point of view."  *Id.* at 134.

By e-mail dated July 12, 2007, Stefanidis told plaintiff that "[s]ince this is the first time we are hiring graduate assistants, I would like to have you meet with the Vice President, " and through a subsequent exchange of e-mails, a meeting was set.  Wigdor Decl., Ex. 41.  Summa claims that this was not an interview, just a "courtesy meeting."  Summa Dep. 320.  Connolly met with plaintiff in person, and with a candidate for a second open position by telephone.  Connolly Dep. 120.  During the interview, Connolly asked Summa if she had any conflicts at the university and Summa "indicated that she hadn't."  *Id.* at 226.

Connolly testified that she identified several "issues" with Summa's resume.  She had concerns regarding plaintiff's representations regarding her programs of study.  Summa had identified her undergraduate major as "Broadcast Journalism/Marketing," which Connolly interpreted to be a dual major.  Connolly Dep. 171.  When questioned on this, plaintiff told Connolly that Broadcast Journalism was her major, but that she had a "great interest in

marketing" for internships.  *Id.* at 184.  In addition, plaintiff identified her Master of Arts program of study as "Speech Communication/Business," which does not exist at Hofstra.  *Id.* at 170.  Plaintiff again explained that she had a great interest in business, which Connolly "took to mean that she was saying she had an interest in business, so she added it onto the end of what was her stated academic program."  *Id.* at 183.  Connolly testified as to her feelings about the importance of accuracy on the issue of programs of study: "I would never accept imprecise, an imprecise title of an academic major on a resume or an academic institution, and that there's no excuse for a less-than-precise use of an academic major, ever."  *Id.* at 187.  Connolly also believed plaintiff had overstated the importance of her duties at an internship.  *Id.* at 178-79.

Subsequent to her meeting with plaintiff, Connolly contacted Matt Sobnosky, graduate director of the Speech Communications program and a person listed in Stefanidis's notes as a reference for plaintiff.  Connolly Dep. 212.  According to Connolly, Sobnosky characterized plaintiff as "all right" and gave a "middle of the road" review that led Connolly to believe that he was "less than enthusiastic" about plaintiff.  *Id.* at 215-16.   He also confirmed that there was no Speech Communication/Business academic program.  *Id.* at 214-15.  Connolly did not contact any other references for plaintiff.

Connolly decided not to offer the Graduate Assistantship to plaintiff.  When Summa learned of the decision, she spoke with Connolly by telephone to demand an explanation.  According to Connolly, Summa asked "'Have you heard that there's a problem about me, or that I have a problem,' or something to that effect, at the university."  Connolly Dep. 225.  Connolly's contemporaneous notes indicate that Summa said it was "mysterious" and that the decision not to offer her the job was "related to another conflict."  *Id.*  When plaintiff mentioned another

12

"conflict," Connolly pointed out to plaintiff that she hadn't disclosed any such conflict during the interview when asked, and then terminated the call by recommending that plaintiff contact human resources. *Id.* at 226-27.

Plaintiff claims that Connolly rescinded the offer of the position that had been offered to, and accepted by, plaintiff and that the actions were in retaliation for plaintiff's prior complaints. Connolly created a file memorandum on July 20, 2007 regarding her meeting with plaintiff, her decision not to offer her the position, and her telephone call with plaintiff after that decision. Wigdor Decl., Ex. 27. In addition to her concerns about plaintiff's resume, and the lukewarm recommendation, Connolly also believed that it was inappropriate for a candidate to involve herself in the internal paperwork issue the way plaintiff had, and that this also factored into her decision. Connolly Dep. 247-49. Connolly's memorandum further states that as a result of the telephone call with Summa, Connolly "was even now more troubled by the allusions she made to another incident which she did not disclose during our initial interview." Wigdor Decl., Ex. 27.

Plaintiff testified that the meeting with Connolly was strange and that Connolly was standoffish. Summa Dep. 322-23. She believes her failure to get the position was "another retaliation move by the university." *Id.* at 328. When asked whether Connolly had said anything during the meeting to indicate that she was aware that plaintiff had filed a claim against Hofstra, plaintiff responded "[n]ot that I recall at this time." *Id.* at 324. Connolly testified that she did not become aware of plaintiff's complaint until winter of 2007 after a press conference. Connolly Dep. 51-52.

**Plaintiff's Complaint to the NYSDHR**

During the time plaintiff was pursuing the Graduate Assistantship position, she was also

pursuing her discrimination claims with the NYSDHR.[2]  On or about May 3, 2007, plaintiff filed

a complaint alleging gender discrimination and retaliation.  Moran Decl., Ex. Z.  Although she

checked 'retaliation' on the form, the complaint itself is the same report dated November 28,

2006 that she had prepared after her meeting with Murphy, and concerns only the November 18,

2006 bus incident.  Hofstra submitted its answer to plaintiff's NYSDHR complaint on May 17,

2007.  Wigdor Decl., Ex. 40.  Plaintiff has provided a file memorandum from the NYSDHR

dated June 4, 2007 and entitled Final Investigation Report and Basis of Determination, but there

is no indication when or if this report was disseminated to plaintiff or Hofstra.  On July 23, 2007,

three days after Connolly made her decision regarding the Graduate Assistantship, the Division

of Human Rights issued a Determination after Investigation. Wigdor Decl., Ex. 25.  Plaintiff

claims that the decision to deny her the Graduate Assistant position was made to retaliate against

her for filing the NYSDHR complaint in addition to her earlier complaint.

**Plaintiff Found Ineligible for University Employment**

On January 25, 2008, plaintiff commenced this case.  Plaintiff continued to work as a

student employee at Hofstra until the summer of 2008.  Summa Dep. 151. According to Miller-

Suber, Director of Human Resources, she was informed by Hofstra's legal department that there

were duplications of hours worked in plaintiff's time sheets.  Miller-Suber Dep. 65-66.  She was

---

[2]Sometime prior to March 15, 2007, plaintiff apparently submitted something to the Equal
Employment Opportunity Commission ("EEOC").  Although this submission is not part of the
record, there is a letter from the EEOC to plaintiff dated March 15, 2007 regarding its review of
her "complaint."  EEOC ltr., Moran Decl. Ex. U.  The letter stated that the EEOC "is not able to
act on your information because it does not have jurisdiction over your complaint," as it
investigates employment discrimination involving employees and she is a student. *Id.*  The letter
advised plaintiff that she might want to file with the New York State Division on Human Rights
("NYSDHR"). *Id.*

told that counsel had made the discovery "[d]uring the investigation of one of her cases." *Id.* at

65.[3] Miller-Suber then looked at plaintiff's time sheets for one pay period in July 2006 and

compared the billings for her position with the public safety office with her time records for her

curriculum and teaching job. *Id.* at 67-68. Her review revealed billings for duplicate dates and

times for both jobs. *Id.* at 68. By letter dated August 26, 2008, Miller-Suber notified the

plaintiff that pursuant to the Student Employment Handbook, she was no longer eligible for

undergraduate, graduate assistant positions or any other paid position because a "review of

University records indicates multiple instances where you submitted and were paid for

duplicative hours." Ltr. of 8/26/08, Moran Decl., Ex. II. Miller-Suber testified that other than

plaintiff, she has not directly terminated a student's "privilege of student employment." Miller-

Suber Dep. 73. Plaintiff claims this action was further retaliation for her earlier complaints, and

for filing this federal lawsuit.

**Federal Discrimination Action**

On June 8, 2009, plaintiff filed her Second Amended Complaint alleging eight causes of

action. Her claims include discrimination, harassment and retaliation under Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§2000e et seq. ("Title VII"), Title IX of the

Education Amendments of 1972, 20 U.S.C. §§1681 et seq. ("Title IX"), and New York State

Human Rights Law, N.Y. Exec. Law §§290 et seq. ("NYSHRL"), and aiding and abetting

violations of NYSHRL.

---

[3]This case had already commenced, however, in addition, plaintiff had another lawsuit pending in
this court regarding payment of overtime at Hofstra. CV 07-3307, *Summa v. Hofstra University.*

**DISCUSSION**

*Standard of Review*

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed.R.Civ.P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all reasonable ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Pub'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution.'" *B.F. Goodrich v. Betoski*, 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish*, 85

F. Supp. 2d at 180 (quoting *Celotex*, 477 U.S. at 322).

District courts are cautious about granting summary judgment when intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Even in the discrimination context, however, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Defendants move for summary judgment on plaintiffs' remaining Title VII discrimination and retaliation claims on substantive grounds, arguing that plaintiffs have failed to make out a prima facie case under either theory. Alternatively, defendants contend that neither Hegde nor Martin has shown that defendants' reasons for taking the actions in question were pretextual.

### I. Applicability of Title VII

As a threshold matter, defendants argue that plaintiff, when acting as a football team manager, was not an "employee" under Title VII, and thus any harassment or retaliation claim arising from her time in that position is not actionable under that statute. Clearly, plaintiff was a graduate student at the time of these events. It has been noted that graduate students hold a "unique dual role . . . as potentially both students and employees." *Bucklen v. Rensselaer Polytechnic Inst.,* 166 F. Supp. 2d 721, 725 (N.D.N.Y. 2001). When considering whether an individual is a "student" or an "employee" for Title VII purposes, some courts have looked to the nature of the work performed by the individual and the relationship between the individual and the institution. *See Cuddeback v. v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (noting that courts have typically refused to treat students as 'employees' for Title VII purposes

"only where their academic requirements were truly central to the relationship with the institution"); *Bucklen,* 166 F. Supp. 2d at 726 (dismissing the plaintiff's Title VII claim where the claimed discrimination did not concern the terms and conditions of his employment, but rather discrimination against him in his role as a student); *Stilley v. Univ. of Pittsburgh,* 968 F. Supp. 252, 261 (W.D. Pa. 1996) (Title VII analysis must focus on employer-employee relationship and "[a]ll issues pertaining to the completion of plaintiff's dissertation relate to plaintiff's role as a student and not as an employee"); *Pollack v. Rice Univ.,* 1982 WL 296, at *1 (S.D. Tex. Mar. 29, 1982) (plaintiff not an employee under Title VII where discrimination occurred in plaintiff's search for employment as a university instructor and thus was "attendant to his capacity as a graduate student"). Here, plaintiff's employment as a football student manager was unrelated to her academic pursuits and accordingly, she should be treated as an "employee" for the purposes of claims arising from that employment. However, as the Second Circuit has not expressly adopted this analysis, I will examine the circumstances surrounding plaintiff's role as student football manager to determine whether she otherwise meets the criteria of an "employee" within the meaning of Title VII.

Under Title VII, an employee is defined as "an individual employed by an employer." 42 U.S.C. §2000e(f). The Second Circuit has adopted a two-part test to apply this "circular" definition. *See United States v. City of New York,* 359 F.3d 83, 91 (2d Cir. 2004). First, plaintiff must establish that she was hired by the putative employer. *Id.* at 92 (*citing O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir. 1997)). "To prove that she was hired, she must establish that she received remuneration in some form for her work." *Id.* (*citing O'Connor,* 126 F.3d at 116); *see also York v. Ass'n of the Bar of the City of New York,* 2001 WL 776944, at *4 (S.D.N.Y. Jul. 11,

2001) (noting that the existence of remuneration, either direct or indirect, "is an essential condition for a relationship to be one of employment under Title VII"). Thus, plaintiff is not an employee under Title VII if she did not receive remuneration for her duties as a football manager.

It is undisputed that plaintiff received cash payment of $700 for her duties, and that the payment was labeled as a "stipend." In their papers, defendants clearly characterize the $700 stipend plaintiff received for the fall football season as "remuneration," *see* Defs.' Mem. at 10, thus conceding that she was paid. Even without that statement, it is clear that a $700 payment is remuneration.

Despite their recognition of the stipend as remuneration, defendants go on to argue that the remuneration did not constitute "substantial benefits not merely incidental to the activity performed." Defs.' Mem. at 10. Courts in this Circuit look to other benefits received in situations where there was *no* monetary payment made to the plaintiff and the courts were left to determine the circumstances in which a person could be an "employee" within the meaning of Title VII even in the absence of such payment. *See O'Connor,* 126 F.3d at 116 (no remuneration where plaintiff received "no salary or other wages, <u>and</u> no employee benefits such as health insurance, vacation, or sick pay" (emphasis added)); *York,* 2001 WL 776944, at *4-5 (where the plaintiff had been an unpaid volunteer, the court examined, and rejected, her claim that she received benefits that effectively constituted indirect compensation)*; see also Pietras v. Board of Fire Comm'rs of Farmingville Fire Dist.,* 180 F.3d 468, 473 (2d Cir. 1999) (finding that a Title VII employment relationship "can exist even when the putative employee receives no salary so long as he or she gets numerous job-related benefits")*.* Here, there was a monetary payment and thus there is no need to examine any additional "benefits" plaintiff may or may not have

received.

The Second Circuit directs that once plaintiff demonstrates that she received

remuneration for her services, the court must examine the thirteen factors articulated by the

Supreme Court in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730 (1989), "to

determine whether an employment relationship exists." *City of New York,* 359 F.3d at 92 (*citing*

*Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 113-14 (2d Cir. 2000)). The

factors to be considered are

> the hiring party's right to control the manner and means by which
> the product is accomplished[;] . . . the skill required; the source of
> the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring
> party has the right to assign additional projects to the hired party;
> the extent of the hired party's discretion over when and how long
> to work; the method of payment; the hired party's role in hiring
> and paying assistants; whether the work is part of the regular
> business of the hiring party; whether the hiring party is in business;
> the provision of employee benefits; and the tax treatment of the
> hired party.

*Reid,* 490 U.S. at 751-52 (footnotes omitted). The greatest emphasis is placed on "the extent to

which the hiring party controls the manner and means by which the worker completes his or her

assigned tasks." *Eisenberg,* 237 F.3d at 114 (internal quotations omitted); *see also Tadros v.*

*Coleman,* 717 F. Supp. 996, 1004 (S.D.N.Y. 1989), *aff'd,* 898 F.2d 10 (2d Cir. 1990) ("A Title

VII plaintiff is only an 'employee' if the defendant both pays him and controls his work").

The parties do not discuss the second portion of the test or apply the factors to plaintiff's

position. Based on the facts presented, however, it is clear that the factors weigh heavily in favor

of a finding that an employment relationship existed between plaintiff and Hofstra during her

time as a football student manager, and indeed not a single factor stands out in favor of finding

20

she was <u>not</u> an employee.  Moreover, there are no factual allegations that would support a finding that plaintiff was an independent contractor.  Thus I find that plaintiff's role as student football manager was as an employee of Hofstra and therefore she may utilize Title VII to pursue a remedy for any discrimination that may have occurred within that employment.

## II. Discrimination Claims

Having won the argument that plaintiff was an "employee" under Title VII, I question whether under the facts presented here, the federal employment discrimination law is applicable to these circumstances.  Every single incident of alleged harassment and objectionable conduct was directed at plaintiff by football players, not a co-worker or supervisor.  Whatever control Hofstra exerted or was able to exert over the players arose from its authority as a university controlling its students, not as an employer controlling co-workers in a work environment.  The tension between plaintiff's dual roles as student and employee is apparent in the parties' submissions to the court as well.  The court will nonetheless attempt to address plaintiff's claims within the context of the employment discrimination laws.

### A.  Title VII and NYSHRL Discrimination claims

Summa claims that she was subjected to a hostile work environment in violation of both Title VII and the NYSHRL.  The defendants argue that even if all of her factual assertions are accepted as true for the purposes of this motion, those facts do not rise to the level of hostile work environment as a matter of law.

Hostile work environment claims under both Title VII and the NYSHRL are generally governed by the same standards.  *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 (2d Cir. 2006).  To establish a hostile work environment claim under Title VII and state law, a

plaintiff must establish, by the production of admissible evidence, that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 102 (2d Cir. 2010) (*quoting Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)). The plaintiff must show both that she subjectively perceived the environment to be abusive and that it was objectively hostile and abusive. *Id.* (internal citations omitted). Title VII was not intended to sterilize employee relations or to create a generalized code of workplace civility. *See Lucas v. South Nassau Communities Hosp.*, 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998); *Nolan v. Epifanio*, 1998 WL 665131, at *3 (S.D.N.Y. Sept. 28, 1998). As such, work-related conduct that may be described as "immature, nasty, or annoying, without more, is not actionable as sexual harassment." *Nolan*, 1998 WL 665131, at *3 (citation omitted).

Plaintiff has identified six incidents of alleged harassment that she claims constitute a hostile work environment. As discussed in greater detail above, the incidents are:

1) the August 2006 training camp incident consisting of players asking for her telephone number and making "unwelcome comments" about her relationship with Hall;

2) August 31 bus trip from Stony Brook during which players commented on her relationship with Hall and asked if she wanted to be with a "real man";

3) the Facebook incident of September 18th;

4) September 30th bus trip from Virginia during which a comment was made about why women shouldn't be managers because they don't know anything about sports, suggestions that plaintiff have sexual relations with Hall on the bus, and "offensive" comments that plaintiff "stunk up the bathroom" and "blew up the bus" after using the restroom;

5) October 14th bus trip from Delaware in which players held the door closed and laughed while she was in the restroom "for "what seemed like a long time to Plaintiff," Pl. Mem. in Opp. at 6; and

6) November 18th bus trip from Massachusetts during which the movie *Shadowboxer* was shown and football player Taylor made an offensive comment regarding white women and black men.

*See* Pl. Mem. in Opp. at 6-7.

### i. Exclusion of Gender-Neutral incidents

"In assessing the 'totality of the circumstances' offered to prove a hostile work environment, a fact-finder may consider only abusive conduct proven to be 'based on sex.'" *Pucino v. Verizon Wireless Commc'ns, Inc.,* 618 F.3d 112, 117 (2d Cir. 2010) (*quoting Alfano v. Costello,* 294 F.3d 365, 378 (2d Cir. 2010); *Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir. 2001)). While plaintiff is correct that she need not establish that the players making the comments were motivated by sexual desire, the comments must be based upon, or made because of, her gender. Acts that are gender neutral and non-sexual in nature do not support a hostile work environment claim. *See Gregg v. New York State Dep't of Taxation & Fin.,* 1999 WL 225534, at *12-13 (S.D.N.Y. Apr. 19, 1999).

Several of the incidents of "harassment" claimed by plaintiff do not clear this hurdle. Clearly, the comments regarding plaintiff having "stunk up the bathroom," while boorish, are not gender-related. In addition, her allegations regarding the incident in which the players held the restroom door shut and laughed for some indeterminate time period do not reflect any gender-specific bias. Again, while such conduct may well be juvenile and immature, it is gender neutral and there is no evidence that it was done "because of" plaintiff's gender.

It is apparent from plaintiff's submissions and the evidence provided that the incident she

believes to be the most egregious is the showing of the movie *Shadowboxer* on the team bus as well as the comment that followed. Although it is not within this court's purview to act as a movie critic, I must note that the 2005 movie *Shadowboxer* is not "pornographic," but rather is an R-rated film starring Academy Award winners Cuba Gooding, Jr. and Helen Mirren. According to the Motion Picture Association of America ("MPAA") website, an "R" rated film is "Restricted. Children Under 17 Require Accompanying Parent or Adult Guardian."[4] The court takes no issue with Hofstra EO Officer Murphy's conclusion that the choice of a DVD offensive to women "reinforced the worst of the negative stereotypes about football players and other contact sport athletes," Murphy memo, Moran Decl. Ex. S, and by no means suggests that the university should not be sensitive to such considerations. The mere showing of such a film to a busload of college students cannot, however, be gender-based, nor can it be deemed to violate federal law. Moreover, there is no evidence suggesting that the decision to air this movie was made because of plaintiff's gender. In addition, plaintiff claims that at least one of the male players also found the film to be offensive. In one of her statements, she claims that "[a]nother player in front of me, Chris Hanley was upset and disgusted that the movie was being shown." Stmt of 11/28/06, Wigdor Decl. Ex. 21; *see also* Murphy Mem., Wigdor Decl. Ex 22 (memorializing interview in which Hanley indicated that he didn't like the movie "and believed it was not appropriate for a team bus"). "[A]n environment which is equally harsh for both men and women . . . does not constitute a hostile work environment under the civil rights statutes." *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir. 1999).

---

[4] *See* MPAA website, www.mpaa.org/ratings/what-each-rating-means. The MPAA further provides, in part, that an R-rated film contains "some adult material" and "may include adult themes, adult activity, hard language, intense or persistent violence, sexually-oriented nudity, drug abuse or other elements." *Id.*

As the above incidents were gender-neutral and there is no evidence that they occurred because of plaintiff's gender, the court will not consider them as evidence of abusive conduct.

### ii. Severity and Pervasiveness

Having eliminated incidents that were not gender-based, I turn now to an examination of whether the remaining incidents were sufficiently severe or pervasive to create a hostile work environment. The determination of whether the alleged conduct meets the threshold of severity or pervasiveness is one that must be based on the "totality of the circumstances." *Harris v. Forklift Sys.,* 510 U.S. 17, 23 (1993). The court must "examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002).

Although plaintiff must subjectively perceive the work environment to be abusive, her perception alone does not establish abuse. Instead, the severity of the conduct must be judged objectively, from the perspective of a reasonable person in the plaintiff's position. *See Harris,* 510 U.S. at 21-22 (1993); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). As "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position considering 'all the circumstances,'" the inquiry in harassment cases requires

> careful consideration of the social context in which particular
> behavior occurs and is experienced by its target. A professional
> football player's working environment is not severely or
> pervasively abusive, for example, if the coach smacks him on the
> buttocks as he heads onto the field-even if the same behavior
> would reasonably be experienced as abusive by the coach's
> secretary (male or female) back at the office. The real social
> impact of workplace behavior often depends on a constellation of
> surrounding circumstances, expectations, and relationships which

> are not fully captured by a simple recitation of the words used or
> the physical acts performed.  Common sense, and an appropriate
> sensitivity to social context , will enable courts and juries to
> distinguish between simple teasing or roughhousing . . . and
> conduct which a reasonable person in the plaintiff's position would
> find severely hostile or abusive.

*Oncale,* 523 U.S. at 81-82.

To the extent that the comments at issue could be considered sexual or gender-based, they do not, when viewed objectively, rise to the level of severity or pervasiveness necessary to support an actionable claim of sexual harassment.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview."  *Harris,* 510 U.S. at 21.  This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory 'conditions of employment.'"  *Oncale,* 523 U.S. at 81. The Supreme Court has noted that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (*quoting Oncale,* 523 U.S. at 80).  If those standards are "[p]roperly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Faragher,* 524 U.S. at 788 (1998) (*quoting* B. Lindemann & K. Kadue, Sexual Harassment in Employment Law 175 (1992)).  Based on these standards, plaintiff's claims of hostile work environment fail as a matter of law because the alleged incidents were not sufficiently severe or pervasive to create a hostile work environment under Title VII.

After eliminating the gender-neutral comments, the remaining incidents are 1) the August 2006 "unwelcome comments" about her relationship with Hall made during training camp, 2) the August 31st bus trip during which players commented on her relationship with Hall and inquired whether she wouldn't prefer being with a "real man," 3) the Facebook incident of September 18th, 4) that part of the September 30th bus trip regarding the comment about the appropriateness of women managers and the suggestion that she and Hall engage in sex on the bus, and 5) Taylor's comment regarding white women and black men made during the movie on the November 18th bus trip.

Many of the comments that plaintiff found offensive concerned questions regarding her relationship with Hall (including that they made an "odd couple"), comments reflecting the speaker's opinion that she would be better off with someone else, and requests for her telephone number. There are no allegations of any physical contact, intimidation, or threats. Simply put, the federal employment discrimination law cannot be read to provide a cause of action for a female employee who is subjected to a handful of inquiries regarding her dating status and her telephone number, or the recipient of occasional boastful statements from "real men." Other than her subjective discomfort, plaintiff has put forth no evidence to suggest this was anything beyond teasing; these comments, objectively viewed, are just the sort of horseplay and "intersexual flirtation" that do <u>not</u> constitute discriminatory conditions of employment. *See Oncale,* 523 U.S. at 81.

As further evidence of a hostile work environment, plaintiff points to a single comment that women shouldn't be managers because they don't know anything about sports. This comment, made on a single bus trip, was made by a player, not a supervisor or even a co-worker.

It is difficult to see how such a remark, made by someone who has absolutely no authority over plaintiff in her employment, can be seen as objectively seen as affecting her working conditions.

The incident regarding the Facebook posting also presents several problems. First, there is no real connection between the posting, made by a football player or players, and plaintiff's employment. "When sexual harassing acts occur outside the workplace, the plaintiff must identify sufficient facts from which to infer a connection between the misconduct and the employment." *Heskin v. Insite Advertising, Inc.,* 2005 WL 407646, at *22 (S.D.N.Y. Feb. 22, 2005). Although the Facebook posting included possible *references* to plaintiff's employment, i.e, "F.B. manager" and "The Wannabe Big Boss Man," the posting concerns her relationship with Hall and does not contain anything that would seem to affect her employment environment. In addition, there is no evidence that it was viewed in the workplace. She did, however, specifically bring this incident to Cohen's attention and thus it will be considered within the totality of the circumstances.

As discussed above, I do not find the showing of the movie *Shadowboxer* to be gender-related. Eric Taylor's comment, however, was clearly directed at plaintiff and was gender-specific. This comment, while disgusting, is not enough by itself to establish a severe and pervasive environment under Title VII. In the totality of the circumstances and looking at the allegations objectively, no reasonable jury could find that a hostile work environment was created by the alleged conduct.[5]

---

[5]I further note that considering the gender-neutral incidents as part of the totality of the circumstances would not change the determination that the no hostile work environment was created.

### iii. Imputing Conduct to the Employer

Even if plaintiff's allegations successfully raised a material issue of fact as to whether a hostile work environment existed, she has not established that there is a basis for imputing objectionable conduct to her employer, Hofstra.   In typical hostile work environment cases, courts make this determination based on whether the harasser was a supervisor or a co-worker. *See Gorzynski,* 596 F.3d at 103 (where the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer); *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) (where an alleged harasser is a co-worker rather than a supervisor, the employer may be held liable where it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it").   The facts presented in this case do not fit the usual mold as there is not a single allegation of objectionable conduct by either a supervisor or a co-worker – all the incidents involved conduct by football players, who were clearly neither supervisors nor co-workers.   While both parties struggle to apply the standards for supervisors and/or co-workers, neither party devotes any discussion or provides legal argument as to which standard, if either, is more appropriate.

The standards for imputing objectionable conduct to the employer are grounded in part on a requirement that the employer have notice of that conduct.   In the current case, whatever "standard" is applied, it is clear that Hofstra may not be held liable for harassment it did not know about.   Once it knew or should have known about harassment, then it had a remedial obligation.   *See generally Dolman v. Willamette Univ.,* 2001 WL 34043744, at *13 (D. Ore. Apr. 18, 2001).   Here, the facts indicate that Coach Cohen took remedial action in those instances where he was made aware of the alleged incidents of harassment.

The first time plaintiff approached Cohen with any complaint was on September 18th regarding the Facebook posting. It is undisputed that Cohen promptly spoke separately to the three players associated with the Facebook page and instructed them to remove the post, which they did. Plaintiff acknowledges that he met with three players and that the posting was removed, but notes that he did not address the entire team, impose discipline, or report the conduct to the EEO office. Pl. Mem. in Opp. at 13. She also claims that Cohen "looked irritated when Plaintiff made her complaint." *Id.* at 17. As the court is unaware of any legal requirement that a supervisor greet a complaint with a particular demeanor, plaintiff's perception of Cohen's reaction does not outweigh the actions he actually took in addressing plaintiff's complaint. Although plaintiff may subjectively feel that Cohen's actions did not go far enough, his response to remedy the situation was swift, appropriate, and legally sufficient.

The only other incident about which plaintiff raised a contemporaneous complaint was the movie viewing on November 18th.[6] It is undisputed that when she complained about the content of the movie to Coach Perry, he immediately turned it off. Plaintiff also does not dispute that Perry instructed the players to quiet down when they began to complain about the movie being turned off. Perry clearly took appropriate and immediate action.

Plaintiff then complained to Coach Cohen about the incident. Plaintiff asserts her subjective belief that Cohen did not take her complaint regarding the movie and Taylor's comment seriously, claiming again that Cohen "appeared irritated" and told her that reporting the

---

[6] Plaintiff claims she raised the August training camp "unwelcome" comments and the August 31st bus ride episode with Cohen during the discussion regarding the Facebook pages, but Cohen disputes this. There is no indication that plaintiff *ever* lodged any complaints regarding the September 30th or October 14th bus trips with the coaching staff. Her only complaints regarding these incidents were made in late November and early December to O'Malley, at the Dean of Students Office, and to Murphy, the Equality Officer.

incident would draw attention to the football program.  Pl. Mem. in Opp. at 17.  Plaintiff's

perceptions of Cohen's reaction are again outweighed by the actions actually taken by Cohen.

Within 48 hours of her complaint, he performed an investigation and removed Taylor from the

team.   His actions were taken without further prompting from plaintiff and without any

knowledge that she complained elsewhere in the university.  The fact that Taylor's removal was

based on the fact that it was his "third strike" is not important to the analysis and is not, as

plaintiff suggests, a material issue of fact.  It is also immaterial that plaintiff feels that the

punishment was insufficient  – again Cohen took prompt, effective, and legally sufficient action.

The law requires that the employer take remedial action upon learning of harassment, and that it

is unquestionably what Cohen did.  Accordingly, to the extent there was harassment constituting

a hostile work environment, no reasonable jury could impute that liability to Hofstra.

### B.  Title IX Discrimination claims

#### i. Private Right of Action under Title IX

Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis

of sex . . . be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving federal financial assistance."  20 U.S.C. §1681(a).  Having

determined that plaintiff was an employee under Title VII, there is a question as to whether, as an

employee, she may also bring a claim under Title IX.  "The Second Circuit 'has not ruled

whether an employee of a federally-funded educational institution can use Title IX to seek

redress for employment discrimination on the basis of sex.'" *Stouter v. Smithtown Cent. Sch.*

*Dist.,* 687 F. Supp. 2d 224, 235 (E.D.N.Y. 2010) (*quoting Bastian v. New York City Dep't of*

*Educ.,* 2008 WL 2930529, at *6 (S.D.N.Y. Jul. 29, 2008) (citing cases)).  While the Second

Circuit expressly declined to reach this question in *Torres v. Pisano,* 116 F.3d 625 (2d Cir.

1997), it did so while noting "that the only circuit to have decided the question has concluded

that an employee of an educational institution has no private right of action for employment

discrimination under Title IX."  *Torres,* 116 F.3d at 630 (*citing Lakoski v. James,* 66 F.3d 751,

754 (5th Cir. 1995)).

     District courts in this circuit "are divided as to whether an implied right of action exists

under Title IX for employees alleging gender discrimination in the terms and conditions of their

employment."  *Stouter,* 687 F. Supp. 2d at 236 (citing cases).  The rationale for allowing an

employee to bring an action "for employment discrimination under Title IX has been (1) 'an

implied private right of action for damages under Title IX for employment discrimination would

disrupt the carefully balanced remedial scheme of Title VII,' and (2) 'Congress intended Title VII

to provide an exclusive avenue of relief' for employment discrimination claims."  *Mehrhoff v.*

*William Floyd Union Free Sch. Dist.,* 2005 WL 2077292, at *10 (E.D.N.Y. Aug. 22, 2005)

(*quoting Vega v. State Univ. of New York Bd. of Trustees,* 2000 WL 381430, at *3 (S.D.N.Y.

Apr. 13, 2000)).   Based upon my review of the applicable case law, I am persuaded that the

better argument is to limit an employee's avenue of redress to Title VII.  *See, e.g.,Towers v. State*

*Univ. of New York at Stony Brook,* 2007 WL 1470152, at *4 (E.D.N.Y. May 21, 2007) (agreeing

with "those courts that have held that Title IX cannot be used to circumvent the remedial scheme

of Title VII"); *Burrell v. City Univ. of New York,* 995 F. Supp. 398, 408 (S.D.N.Y 1998) (the

court was "persuaded that the remedies of Title IX are limited to student plaintiffs, and Title VII

is meant to offer the exclusive remedy for employment discrimination based on sex").  As I have

determined that plaintiff was an employee for purposes of Title VII, she may not seek recovery under Title IX, and her claim of discrimination under Title IX must be dismissed.

### ii.  No Discrimination Established

As discussed above, plaintiff may not utilize the private right of action established under Title IX to recover for discrimination she may have experienced as an employee.  Even if plaintiff had a cognizable claim under Title IX as a student, it too would fail.  While courts recognize student-on-student harassment claims under Title IX, "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment."  *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 653 (1999).  To prevail on a claim of Title IX student-on-student harassment against a university, plaintiff must show (1) that the university was a recipient of federal funds; "(2) that it 'act[ed] with deliberate indifference to known acts of harassment in its programs or activities;' and (3) that the harassment was 'so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit." *Sauerhaft v. Board of Educ. of Hastings-on-Hudson Union Free Sch. Dist.,* 2009 WL 1576467, at *4 (S.D.N.Y. June 2, 2009) (*quoting Davis,* 526 U.S. at 633).  While plaintiff clearly satisfies the first prong, that Hofstra receives federal funding, she fails to establish the remaining factors.

Deliberate indifference to known acts of harassment when the harasser is a student may amount to a violation of Title IX.  *Davis,* 526 U.S. at 643.   A university is "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the

harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. The university "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 649. Deliberate indifference may also be found when "remedial action only follows after a lengthy and unjustified delay" *Hayut v. State Univ. of New York,* 352 F.3d 733, 751 (2d Cir. 2003) (citation omitted). As discussed *supra,* university employees responded reasonably and promptly every time they were made aware of plaintiff's claims of harassment.

Plaintiff has also failed to demonstrate that the harassment she allegedly suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to an educational opportunity or benefit. A claim for Title IX hostile education environment is "governed by traditional Title VII 'hostile environment' jurisprudence." *Hayut,* 352 F.3d at 744. "A Title IX plaintiff must show that [s]he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [her] educational environment." *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* — F.3d —, 2011 WL 199124, at *5 (2d Cir. Jan. 24, 2011) (citations omitted). As discussed at length, *supra,* plaintiff has failed to establish that the events about which she complained were severe or pervasive under the meaning of the law. Accordingly, to the extent plaintiff has standing to assert a Title IX cause of action for discrimination, that claim is unsuccessful.

### III. Retaliation Claims

Retaliation claims under both Title VII and the NYSHRL are also governed by the same

standards.[7]  *Schiano,* 445 F.3d at 609.  The analysis uses the burden-shifting framework

established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  *See Terry v.*

*Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).  To establish a prima facie case of retaliation under

Title VII and state law, "a plaintiff is required to show: '[1] that she engaged in protected

participation or opposition under Title VII, [2] that the employer was aware of this activity, [3]

that the employer took adverse action against [her], and [4] that a causal connection exists

between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part

in the adverse employment action.'"  *Marshall v. New York City  Bd. of Elec.*, 322 Fed.Appx. 17,

19 (2d Cir. 2009) (*quoting Cifra v. General Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001) (internal

quotations omitted)).  If the plaintiff establishes a prima facie case,  "the burden shifts to the

defendant to articulate legitimate, nondiscriminatory reasons for their actions."  *Terry*, 336 F.3d

at 141.  If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the

defendant's proffered reasons are simply a pretext for retaliation.  *Johnson v. County of Nassau*,

480 F. Supp. 2d 581, 600 (E.D.N.Y. 2007) (citation omitted).

### A.  Protected Activity

Defendants have stated that, for the purposes of this motion, they will assume that

plaintiff has established the first element of her retaliation claim, and concede that plaintiff's

November 2006 internal complaint of harassment and her May 2007 filing of a complaint with

the NYSDHR constitute protected activity.  Plaintiff points to the filing of this federal case as

another instance of protected activity for which the plaintiff was retaliated against by Hofstra's

---

[7]The same standards are also used to analyze Title IX retaliation claims. *See Bastian,* 2008 WL
2930529, at *7. Thus, even if plaintiff were able to present a Title IX retaliation claim, it would
share the same fate as her Title VII and NYSHRL retaliation claims, discussed *infra.*

decision declaring her ineligible for student employment.

Despite defendant's concession, the court finds as a matter of law that her complaints made in November 2006 and May 2007 do not constitute protected activity underlying a claim for retaliation. "To establish that she engaged in protected activity, a plaintiff must show only that she had a good faith, reasonable belief that the conduct of her employer about which she complained violated Title VII." *Pinner v. Budget Mortg. Bankers Ltd.,* 169 Fed.Appx 599, 600 (2d Cir. 2006); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (plaintiff must demonstrate "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law"). The question on retaliation is not solely whether plaintiff had a genuine belief that she was the victim of discrimination, but rather was that belief *objectively reasonable* under the totality of the circumstances. *See Galdieri-Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir. 1998); *Spadola v. New York City Transit Auth.,* 242 F. Supp. 2d 284, 291 (S.D.N.Y. 2003).

Plaintiff made two complaints in November 2006. First, she filed a written complaint on November 18th with the Department of Public Safety limited to the events of that day's bus ride. *See* Dep't of Public Safety Stmt, Wigdor Decl., Ex. 17. Plaintiff was well-aware that this complaint was treated as a student-on-student complaint and was, in fact, addressed by the university as such in a student disciplinary proceeding.

The second written complaint, filed by plaintiff and dated November 28, 2006, was submitted at the suggestion of Hofstra's Equality Officer, Maureen Murphy, and prepared after the two met. *See* Stmt of 11/28/06, Wigdor Decl., Ex. 21. That complaint, while providing greater detail, is also limited to the event of November 18th and its immediate aftermath.

36

Although plaintiff purportedly raised her additional claims of harassment with Murphy during their meeting, she did not include those allegations in the written complaint. In addition, during the meeting between Murphy and plaintiff, Murphy told her that because the complaint was against Taylor, it would be handled by the student judiciary board, Murphy Dep. 141-42, and that since she was making a "student-to-student" complaint, it would be forwarded to the Dean of Students. *Id.* at 143.

The complaint plaintiff filed with the NYSDHR in early May 2007 consists only of the same November 28, 2006 complaint and a cover form upon which she checks the basis of the discrimination as gender and retaliation. Although there is no evidence in the record regarding her claim of retaliation, based upon the NYSDHR disposition, it would appear to be based upon her failure to get the football student manager position for the spring 2007.

Based on these circumstances, it was not objectively reasonable for plaintiff to believe that she had suffered from Title VII employment discrimination based upon the events of November 18th. In addition, she was aware that both the public safety complaint and the November 28th complaint were being treated by the university as a "student-on-student" issue, and not as an employment issue. I find that plaintiff did not have a good faith, reasonable basis to believe that the events of November 18, 2006 constituted employment discrimination, and thus, when she made the "complaints" of November 18, 2006, November 28, 2006, and May 2007, she was not engaged in "protected activity." Accordingly, her retaliation claims premised on that activity cannot stand.

Given the defendants' decision to "assume" there was protected activity, plaintiff did not have the opportunity to address this element. In the interest of fairness, I will analyze the

remaining factors necessary to establish retaliation as if plaintiff had established protected activity.

### B. Knowledge of the Protected Activity

Plaintiff argues that to satisfy the knowledge of protected activity requirement nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity." *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000). Clearly, several Hofstra officials – including Coach Cohen, Maureen Murphy, the Equality Officer, and Lynda O'Malley from the Office of the Dean of Students – were aware of plaintiff's 2006 and 2007 complaints, and at the very least, the legal office at Hofstra was aware of the filing of the current litigation. The court agrees that this knowledge of plaintiff's complaints established that the "employer," Hofstra, was aware of her protected activity.

### C. Adverse Action

With respect to the third element, defendants concede that the following determinations constitute adverse employment actions taken against plaintiff: 1) the denial of the football team student manager position for Spring Ball in spring 2007, 2) the denial of the Graduate Assistantship position with University Relations in summer 2007, and 3) the termination of her privilege of student employment in August 2008. Plaintiff claims that there is a fourth incident of retaliation – the hand delivery of the letter terminating her student employment by a public safety officer at plaintiff's workplace. She does not, however, explain how this action is adverse and the court will not address it.

### D. Causal Connection

The final element to establish a prima facie case of retaliation is a showing that a causal

connection exists between the protected activity and the adverse action. In this Circuit, "[p]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon,* 232 F.3d at 117.

Causality may be inferred through timing alone where the temporal proximity between an employer's learning of protected activity and the adverse employment action following thereafter are "very close." *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). There is no strict measurement for when temporal proximity for the purpose of inferring causation becomes too attenuated. In general, district courts in this Circuit "have found that 'a passage of two months between the protected activity and the adverse employment action seems to be the dividing line.'" *O'Neal v. State Univ. of New York,* 2006 WL 3246935, at *15 (E.D.N.Y. Nov. 8, 2006) (*quoting Cunningham v. Consol. Edison, Inc.*, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases). Recent decisions have found that gaps in time up to four months may support a finding of causality. *See Hubbard v. Total Commc'ns, Inc.*, 347 Fed.Appx. 679, 681 (2d Cir. 2009) (holding that four month period between protected activity and employee's termination did not present "the outer limit" of temporal proximity and jury was entitled to find there was a causal connection)*; Levitant v. City of New York Human Res. Admin.*, 625 F. Supp. 2d 85, 108-109 (E.D.N.Y. 2008) (finding that three and four month gaps did not necessarily preclude jury finding of causation).

Other factors may be considered to establish causation or its lack. While general

corporate knowledge of protected activity suffices to satisfy the second element of a retaliation

claim, the extent of the actual decisionmaker's knowledge may be relevant to the causation

prong. The lack of knowledge on the part of a decisionmaker "is admissible as some evidence of

lack of a causal connection, countering plaintiff's circumstantial evidence of proximity."

*Gordon,* 232 F.3d at 117; *see also Sundaram v. Brookhaven Nat'l Lab.,* 424 F. Supp. 2d 545, 584

(E.D.N.Y. 2006) (stating that "there is no evidence that any of the decisionmakers was aware of

the plaintiff's protected activity and thus no evidence of a causal connection between the

protected activity and the defendant's hiring decision"). In addition, "district courts have

consistently held that, with regard to the causation prong of the prima facie standard, absent any

evidence to support an inference that the decisionmakers knew of plaintiffs complaints, plaintiff

cannot rely on circumstantial evidence of knowledge as evidence of causation." *Murray v.

Visiting Nurse Servs. of New York,* 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007); *see also

Philippeaux v. Fashion Inst. of Tech.,* 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996) (plaintiff

must demonstrate "not only that [the school] as an entity knew of his engagement in the protected

activity, but also that the actual decisionmaker(s) knew about it as well").

     With these standards in mind, I will address whether there is a causal connection to each

adverse employment action.

### i. Spring Ball 2007 Student Manager Position

     The parties characterize plaintiff's claim regarding this position differently – plaintiff

claims she terminated from her position in retaliation for making complaints of discrimination,

while defendants state that her claim is that she was denied the opportunity to be the manager for

Spring Ball. In either event, the elements of proof are unchanged.

Plaintiff is unable to establish causation as there is no direct evidence of retaliatory animus, and there is no evidence that the individual responsible for hiring student managers, Equipment Manager Battaglia, knew of her complaints of discrimination. Instead, plaintiff suggests that the defendants have focused on the role of Battaglia to "divert attention from Defendant Cohen's role" in retaliating against plaintiff. Pl. Mem. in Opp. at 19. Despite this suggestion, she has provided no evidence to support her claim that Cohen took any action whatsoever in regard to staffing the student manager positions. Cohen, the Head football coach, did not hire the student football managers – in August 2006, the task fell to one of his assistants; in spring 2007, it was Battaglia's job. Thus his awareness of her complaints is not relevant to this analysis. She has not refuted the evidence that Battaglia was the decisionmaker responsible for filling the football student manager positions, and that he did so while unaware of plaintiff's complaint to the university regarding Taylor. As she has failed to establish a causal connection between her complaint and the adverse action, her claim for retaliation fails.

### ii.  Graduate Assistantship

The parties again characterize the adverse action differently. Defendants claim that they declined to offer the Graduate Assistantship to plaintiff, while plaintiff argues that she was offered the position and accepted it, only to have it rescinded in retaliation for filing complaints.

The decision of Connolly, the Vice President of University Relations, to not offer plaintiff the position was rendered in late July 2007. Plaintiff filed her complaint with the NYSDHR in May 2007, and a determination from that entity was issued in June 2007. Given the temporal proximity of these events, causality may be inferred.

<u>iii. Termination of Student Employment Privilege</u>

The final adverse action is Hofstra's decision, in August 2008, deeming plaintiff ineligible for continued or future student employment at the university. Plaintiff argues that there is sufficient evidence of direct causation to defeat defendants' motion for summary judgment. She paraphrases the testimony of Miller-Suber, the Director of Human Resources, that she was "specifically instructed by University counsel to review Plaintiff's timesheets and that such review was related to Plaintiff's sexual harassment lawsuit." Pl. Mem. in Opp. at 24. This statement is simply inaccurate. Miller-Suber's actual testimony was that "[d]uring the investigation of one of her cases, I was informed by the legal department that they had gone through the time sheets . . . [and] that there was duplications of hours in the time sheets." Miller-Suber Dep. 65. First, as mentioned above, plaintiff is involved in more than one federal lawsuit against Hofstra and the testimony does not identify in which litigation the discovery was made. Regardless of which lawsuit counsel was referring to, however, Miller-Suber was not "directed" to do anything, she was simply informed that someone had uncovered a discrepancy. The reporting of that discovery to her does not constitute retaliatory animus, nor does her decision to investigate that discovery once it was reported to her.

As to indirect evidence of causation, defendants argue that this decision to terminate plaintiff's employment eligibility is simply too remote from the November 2006 complaint to support a determination that there was a causal connection between the two events. Plaintiff, however, states that the August 2008 decision was in retaliation for plaintiff's filing of *this* lawsuit in January 2008. Even using plaintiff's measure, there is a seven-month gap between the protected activity of commencing this litigation and the alleged retaliatory act of prohibiting

plaintiff from holding student employment. I find that the decision regarding her employment eligibility is too temporally remote from the protected activity, as a matter of law, and thus causality may not be inferred.[8]

### E. Legitimate, Nondiscriminatory Reasons and Pretext

To the extent plaintiff succeeds in establishing a prima facie case of retaliation, the burden shifts to defendants to articulate legitimate, nondiscriminatory reasons for their actions. Defendant's burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000) (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993).

If defendants articulate legitimate, nondiscriminatory reasons, the burden falls upon plaintiff to show that their reasons are merely a pretext for retaliation. "[O]nce the defendant has presented a non-discriminatory or non-retaliatory reason for its employment action, it is entitled to summary judgment 'unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination [or retaliation].'" *Milano v. Astrue,* 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008) (*quoting James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000)) (alteration in original), *aff'd,* 382 Fed.Appx. 4 (2d Cir. 2010). To establish pretext, plaintiff must show both that the reason was false and that the discrimination was the real reason. *See Clayborne v. OCE Bus. Servs.,* 381 Fed.Appx. 32, 35 (2d Cir. 2010) (*citing Fisher v. Vassar Coll.,* 70 F.3d 1420, 1433 (2d Cir. 1995)).

---

[8]Even if she were able to clear this bar, defendant had a legitimate reason for terminating her employment eligibility – the enforcement of its policies regarding duplicate billings. Beyond her single reference to the discovery of "alleged" double billing, plaintiff never disputes the finding that she submitted time sheets for duplicate time periods, nor does she point to evidence to support her claim that Hofstra's reason was pretextual.

The defendants have articulated a legitimate, non-retaliatory reason for not offering plaintiff the Graduate Assistantship position. The misstatements on plaintiff's resume concerning her academic program raised a red flag for Connolly and resulted in further scrutiny of plaintiff's application including calling a reference. There is no issue of material fact regarding plaintiff's misstatements on her resume. Although she attempts to minimize their import or suggest that she should have been given the opportunity to correct those statements, she does not suggest that the statements are accurate. Plaintiff's misrepresentations constitute a legitimate, no-discriminatory reason for Connolly's decision to not hire her. *See Wrenn v. New York State Office of Mental Health,* 771 F. Supp. 594 (S.D.N.Y. 1991) (misrepresentations on resume and in interview, inappropriate responses and poor demeanor during interview, and telephone reference check satisfied defendant's burden).

As defendants have met their burden demonstrating a legitimate, nondiscriminatory reason for its decision, plaintiff must demonstrate that the nondiscriminatory reason was merely pretext for discrimination. As discussed above, plaintiff acknowledges that her resume contained "misstatements." In addition, the Plaintiff has failed to come forward with evidence that retaliatory animus played a part in motivating the decision to not offer her the Graduate Assistantship. Her showing of temporal proximity of her NYSDHR to that decision was sufficient for the purposes of establishing a prima facie case of retaliation under Title VII, "but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010). In short, plaintiff has utterly failed to establish that defendants' business decision was pretextual, or that there is any material issue of fact to be decided. Plaintiff's claim of retaliation

in denial of the Graduate Assistantship must also be dismissed.

## IV. Claims Against the Individual Defendants

Plaintiff has alleged two causes of action for aiding and abetting violations of NYSHRL, one against each of the individual defendants. Under the NYSHRL, "it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'" *Feingold v. New York,* 366 F.3d 138, 157-58 (2d Cir. 2004) (*quoting* N.Y. Exec. Law §296(6)). Aiding and abetting liability arises only where an underlying violation has taken place. *See Nicholson v. Staffing Auth.,* 2011 WL 344101, at *2 (S.D.N.Y. Feb. 1, 2011) (noting that "[a] predicate requirement of aider-and-abettor liability is a finding of primary liability as to the employer" (citations omitted)). As the court has found that there was no underlying violation of the NYHRL, plaintiff's claims for aiding and abetting must be dismissed as well. *See Falchenberg v. New York State Dep't of Educ.,* 338 Fed.Appx. 11, 14 (2d Cir. 2009). Accordingly, plaintiff's aiding and abetting claims against the individual defendants are dismissed *sua sponte.*

## CONCLUSION

For all the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, plaintiff's claims are dismissed, and the Clerk of the Court is directed to close the case.

Dated: Central Islip, New York
      April 7, 2011

**SO ORDERED:**

  /s/William D. Wall
WILLIAM D. WALL
United States Magistrate Judge